FILED

03/17/2021

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs November 4, 2020

## STATE OF TENNESSEE v. ARIEL K. ROBINSON, CHRISTOPHER A. DUNCAN and TIMOTHY DAVID SHOFFNER

**Appeal from the Circuit Court for Cheatham County**
**No. 17880     Suzanne Lockert-Mash, Judge**

_____

### No. M2020-00058-CCA-R3-CD

_____

In this consolidated appeal, Cheatham County juries convicted the defendants, Ariel K. Robinson, Christopher A. Duncan and Timothy David Shoffner, of attempted second degree murder, aggravated arson, especially aggravated kidnapping, aggravated burglary, and theft of more than $2,500 but less than $10,000.  The trial court sentenced the defendants to thirty-seven, seventy-eight and 162 years respectively.  On appeal, Defendant Shoffner contends that: (1) the trial court erred when it denied his motion to dismiss because the indictment did not adequately charge him with the offense of attempted first-degree murder.  Defendant Duncan contends that: (2) the trial court improperly denied his motion to suppress.  Defendants Robinson and Shoffner contend that: (3) the State delayed their viewing of the evidence before trial.  Defendants Duncan and Shoffner contend that: (4) the State failed to establish a sufficient chain of custody for certain physical evidence; (5) the trial court improperly admitted cell phone tower maps; and (6) the trial court erred when it did not instruct the jury on facilitation.  Defendant Robinson contends that: (7) the trial court erred when it denied her impeachment request.  All three defendants contend that: (8) the evidence is insufficient to sustain their convictions; and (9) the trial court erred when it sentenced them.  After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Crystal M. Morgan, Ashland City, Tennessee, for the appellant, Ariel K. Robinson.

Jennifer L. Honeycutt and Raquel Avina Abel, Franklin, Tennessee, for the appellant Christopher A. Duncan.

Michele Denise Hodges, Nashville, Tennessee, for the appellant Timothy David Shoffner.

Herbert H. Slattery III, Attorney General and Reporter; Clark B. Thornton and Benjamin A. Ball, Senior Assistant Attorneys General; Wendell Ray Crouch, Jr., District Attorney General; and David W. Wyatt and Margaret F. Sagi, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
## I. Preliminary Motions and Trial

This case arises from the defendants invading a home owned by Frank S. Burnette, who was Defendant Shoffner's former stepfather. For alleged offenses that occurred during the home invasion, a Cheatham County grand jury indicted the defendants for attempted first-degree murder, aggravated arson, especially aggravated kidnapping, aggravated robbery, and theft of property valued over $10,000 but less than $60,000.

## A. Motion to Dismiss

Defendant Shoffner filed a motion to dismiss the indictment, claiming that the indictment failed to charge an essential element of the offense of attempted murder. He asserted that there were no elements for the charge of attempted murder listed nor was the applicable statute cited. The State countered that the indictment sufficiently placed Defendant Shoffner on notice, as the indictment alleged that, "on or about April 11, 2016, prior to the indictment, in the County of Cheatham, then and there, did unlawfully, knowingly, deliberately, feloniously, and with premeditation attempt to kill Frank S. Burnett in violation of 39-12-101, a Class A felony . . . ."

The court found:

> [T]he State and Federal Constitution, of course, guarantees a defendant that they will have knowledge and nature of the offense. And to be sufficient, an indictment must inform the defendant of a precise offense.
>
> It must enable the Court, upon conviction, to enter a judgment, an appropriate judgment, and it must protect the defendant from double jeopardy. That's basically what you have for an indictment in regard to the language and the notice of that.
>
> And it's designed to, of course, afford the defendant an adequate opportunity to prepare for trial and adequate defense. And if there's a failure

2

to specifically allege an element of the offense, it's not necessarily fatal if the elements are necessarily implied from the allegations made.

And if the offense is alleged in such a way that the defendant can't fail to be apprised of the elements of the offense, then the charge is sufficient, notwithstanding the fact that an element may . . . not be specifically alleged.

But in looking at this, you have the situation where the District Attorney's Office have done the indictment . . . [a]nd they slipped in that word "deliberately." . . . But there's no longer a deliberate in a murder case.

You all are the third DA's office that I've told that to . . . . I've told each DA, you all need to change your indictments.

But, in doing the research on the other cases, I've found . . . State v. Christian and White v. State. And it exactly had an attempted murder charge.

And it stated, ["]If anything, the addition of deliberately creates a higher burden on the State. Deliberate means to act with a cool purpose. Pre-meditated means done after exercise of reflection and judgment.["] And in that Court, they had stated that the deliberate would suffice for intentional.

So I will deny your Motion to Dismiss. The indictment is sufficient, even though it is an error.

The trial court denied Defendant Shoffner's motion to dismiss, and Defendant Shoffner appeals that finding.

## B. Motion to Suppress

Before trial, Defendant Duncan moved to suppress statements that he made to law enforcement on or about April 11, 2016, and any evidence obtained during a search by law enforcement of the vehicle he was driving that same day. The basis for his motion was the "absence of procedural safeguards related to" the custodial interrogation and the search. At the motion to suppress hearing, the parties presented the following evidence: Lieutenant Heflin testified that that he was the Lieutenant over the Criminal Investigation Division ("CID") for the Cheatham County Sheriff's Department at the time of this investigation. On the morning of April 11, 2016, he responded to a report of an arson and kidnapping off of Cheatham Dam Road. The victim informed him that the suspects had tied the victim up, beaten him, and held him against his will while trying to obtain his pin number to retrieve money from his bank account. Lieutenant Heflin recalled that, a year before he had been to

the victim's residence in an attempt to locate Defendant Shoffner as part of an investigation into an unrelated violent offense in Montgomery County.

Lieutenant Heflin subpoenaed the bank records, learned at which locations the card had been used, and then obtained video footage from those locations. The pictures from the video footage appeared to match Defendant Shoffner's driver's license photograph. Lieutenant Heflin said that he learned that Defendant Shoffner was staying with Defendant Robinson, and he sent narcotics agents to Defendant Robinson's address to "make contact" with Defendant Shoffner.

Officer Hundley, a narcotics officer at the time with the Cheatham County Sheriff's Office, testified that he and other officers went to Defendant Robinson's house at Lieutenant Heflin's request. There, he saw several people inside the home through the home's front windows. He and other officers approached the house, and Defendant Robinson greeted them at the front door. Officer Hundley identified himself and the other officers, who were all in plain clothes, as law enforcement officers, and they asked to speak with Defendant Shoffner, whom he saw inside the front living room area on a phone call. Defendant Shoffner ended his phone call, and Officer Hundley asked to speak with him outside. Defendant Shoffner agreed, saying he first needed to retrieve his shoes.

Officer Hundley said that he recognized Defendant Shoffner, by face and by clothing, from surveillance footage from the locations where the victim's ATM card had been used. He explained that he had retrieved some surveillance footage from a gas station in Clarksville to look for evidence that any of the suspects attempted to use an ATM card at the gas station. The footage showed a man dressed in a Tennessee Titans jersey arriving in a blue Mercury Marquis enter the store and attempt to use the ATM located to the left of the front doors. Officer Hundley said he placed Defendant Shoffner in handcuffs and read him the *Miranda* warnings before speaking with him outside. Officer Hundley then contacted Lieutenant Heflin and informed him that they had located Defendant Shoffner.

Lieutenant Heflin arrived at Defendant Robinson's house where he briefly spoke with Defendant Shoffner in an attempt to ascertain who had accompanied him in the blue Mercury Marquis. Defendant Shoffner told him that he had been in the vehicle with Defendant Duncan and offered addresses and contact information for Defendant Duncan. Lieutenant Heflin went to the address Defendant Shoffner offered and saw a blue Mercury Marquis matching the security footage. Defendant Duncan was in the driver's seat of the vehicle, and he had a female passenger.

Lieutenant Heflin immediately detained Defendant Duncan and read him his *Miranda* rights. Defendant Duncan then agreed that he was the man in the surveillance footage who attempted to use the victim's ATM card in a store. He explained that Defendant Shoffner

had given him the debit card and asked him to try to get money from the account associated with the debit card in exchange for some of the money. Defendant Duncan gave the officers consent to search the Mercury Marquis. Lieutenant Heflin patted down Defendant Duncan for officer safety and found in Defendant Duncan's pockets the victim's white cell phone and some paperwork belonging to the victim. In the vehicle, Lieutenant Heflin and other officers found a camera that contained pictures of the victim's family and duct tape that matched the duct tape on the victim's clothing. Upon completion of the search, the lieutenant had the vehicle towed and stored in law enforcement possession. The lieutenant later obtained a search warrant and again searched the vehicle.

During cross-examination, Lieutenant Heflin said that he did not immediately obtain an arrest warrant for Defendant Duncan based upon Defendant Shoffner's statements because he felt he needed more corroboration. The lieutenant recalled that Defendant Duncan had a passenger, and they were both belligerent and yelling profanities when the officers first approached them. He described the situation as chaotic and said that, for the safety of himself and other officers, he detained Defendant Duncan and offered him his *Miranda* warnings.

Upon questioning by the trial court, the lieutenant said that Defendant Duncan did not appear afraid when he gave consent to search the vehicle. He further testified that Defendant Duncan appeared to understand the process and that, at no time, did he refuse consent to search.

Agent Amy Lamping testified that she was also present on April 11, 2016, at the time of the vehicle search. She said that she arrived in a separate vehicle and that there were other officers at the scene. Agent Lamping confirmed that the officers did not have their guns drawn. She said she did not have the ability to record the interaction because she and her vehicle were not equipped with video or audio recording capabilities.

Defendant Duncan testified that on April 11, 2016, he went to the trailer park to see his girlfriend, with whom he was arguing. When he backed into the parking space, unmarked police vehicles blocked in his vehicle. He alleged that Agent Lamping approached his vehicle with her weapon drawn. He said officers immediately handcuffed him. Defendant Duncan testified that they searched his vehicle without consent. He said that he objected to their searching his vehicle. Defendant Duncan said that the officers retrieved his cell phone and began reviewing his text messages and photographs.

During cross-examination, Defendant Duncan testified that officers never offered him *Miranda* warnings and that law enforcement officers were lying when they said that they had done so. He clarified that he had, in fact, told the officers that Defendant Shoffner had given him a debit card that morning. He noted further that, when the officers asked to

5

search his vehicle, he said "no" and did not give them consent. Defendant Duncan said officers were also lying when they said that they found the victim's papers and phone on him. Defendant Duncan agreed that he had previously been convicted of several felonies, including a manufacturing of a methamphetamine-related conviction, theft, and several vehicle burglaries.

Based upon this evidence, the trial court noted that it must make its ruling based upon its determination of the witnesses' credibility, because Defendant Duncan said law enforcement officers did not give him *Miranda* warnings before he made his statement, and the law enforcement officer said that he had in fact offered Defendant Duncan his *Miranda* warnings. The trial court "g[a]ve credibility to the witnesses and the officer" and gave "little to no credibility to Defendant [Duncan]."

The trial court further found that the officers had "exigent circumstances" to search the vehicle because law enforcement officers had probable cause to believe they would find evidence of a crime in the vehicle. The trial court found, however, that the officers also had Defendant Duncan's consent to search the vehicle. Considering the totality of the circumstances, the trial court found that Defendant Duncan's consent was voluntary. It noted that Defendant Duncan was twenty-six years old, had a criminal history involving several interactions with law enforcement, had no type of physical or mental disability, and that the officers had testified that they did not have their weapons drawn when Defendant Duncan gave consent. The trial court found that Defendant Duncan's consent was voluntary, in that it was unequivocal, specific, intelligently given, and uncontaminated by any duress or coercion. It further found that the subsequent search was valid and his statement to police was voluntary. The trial court denied Defendant Duncan's motion to suppress.

## C. Trial

At the defendants' trial on the charges of attempted first-degree murder, aggravated arson, especially aggravated kidnapping, aggravated robbery, and theft of property valued over $10,000 but less than $60,000, the parties presented the following evidence: On April 11, 2016, the victim was living in a four-bedroom, two-story house on Beech Grove Road that he had built himself in 1980. In 2008, the victim married his third wife, Yi Chung Hey, who had three children. Defendant Shoffner was one of her children. The victim and Ms. Hey were married and divorced twice. The two divorced for the last time in 2015, and the victim lived alone at the time of these events. At some point during the duration of their marriages, , Defendant Shoffner lived with them in the Beech Grove Road home for about three or four months.

The victim recalled the events leading to this attack. He said that, on April 10, 2016, he worked on his house all day. He then purchased some beer, drinking a six-pack right

6

before he went to bed, still fully clothed, at 11:00 p.m. or 12:00 a.m. in the bedroom located on the main floor. His wallet and keys were in the front pocket of his clothing. The victim recalled being awoken by a female, whom he later identified as Defendant Robinson, shaking him and telling him repeatedly to get up. When he awoke, there was also a man, whom he later identified as Defendant Duncan, in the room, and the two told him to go from the bedroom into the living room. Thinking they were law enforcement officersand seeing that at least Defendant Robinson was armed with a gun, he complied with their request.

When he went into the living room, the victim complied with Defendant Robinson's orders to sit down on the floor with his hands raised, as if he were being arrested. The assailants took off his $185 Citizen watch and $100 gold ring, and the victim determined that he was being robbed and not arrested. The assailants, neither of whom wore face-coverings for the duration of the events, then bound his hands behind his back with duct tape and bound his crossed legs together at his ankles. The victim recalled that Defendant Duncan bound him with duct tape while Defendant Robinson gave the victim instructions with which he was to comply. After he was bound, the assailants took the contents of his pockets, including his billfold and a knife. The victim watched as Defendant Duncan went through the house in what appeared to be an attempt to find things of value. He emptied the victim's drawers, and there were papers all over the bedroom, which the victim could see from his position in the living room.

The victim recounted how the assailants asked for the PIN number to his ATM card, which he attempted to provide to them. Defendant Robinson asked the victim how to open the victim's white Samsung 3 Galaxy phone, and he told her that she must make a zig zag with her finger on the face of the phone. She did as he instructed, and she used the phone to place a phone call to a third person, to whom she relayed the PIN number. When the third person informed Defendant Robinson that the PIN did not work at the ATM machine, Defendant Duncan kicked the victim both in the body and the head and asked him for the PIN number again. The victim again provided it, but again it did not work, and Defendant Duncan again kicked the victim. He then pointed a gun to the back of the victim's head and forcefully asked for the PIN number. The victim again gave him the PIN number, swearing to the assailants that it was the proper number. This happened four or five times. At one point, Defendant Duncan became so incensed that the PIN number was not working that he fired the gun inside the home. The victim said that it was not until after this incident that he realized that he had accidentally given the assailants the wrong PIN number.

The victim testified that Defendant Robinson discussed the security system in the home, and the victim told her truthfully that it was not working. She instructed Defendant Duncan to remove it from the victim's pantry anyway. On a desk near the pantry, the victim kept his computer, a red digital camera, and other odds and ends. The victim estimated that, after he had been bound for approximately one hour, Defendant Robinson said to Defendant

7

Duncan that they had been there long enough, and the victim watched as Defendant Duncan left and returned with a gasoline can. He poured gas out on the floor from the front door towards the home's fireplace, turned around, and poured it as he walked back toward the front door. Defendant Duncan looked at him and said, "I don't want to kill ya," but then turned around and lit the room on fire. The victim said that the room filled with black smoke quickly. He noted, however, that the mudroom door was open, so he scooted on his hands and knees out that door and then down the basement steps.

He went into a bedroom downstairs to hide, and he got his left hand loose before both assailants came down into the basement looking for him. Defendant Robinson pointed the gun at him, the victim held up his hand, and Defendant Robinson said that she did not have to kill him because he had no idea who she was and had never seen her before. Defendant Robinson then attempted to fire the gun at him, but the gun did not work. She attempted to fix it and fire it again, but it again did not work. Defendant Robinson said something to Defendant Duncan and left, and Defendant Duncan shot his gun at the victim twice, but seemingly intentionally missed high over his head and to the left. After shooting, Defendant Duncan also left. The victim used his left hand to unbind his legs and right hand and then ran to his niece Kristine Sproat's house, who lived nearby. He was wearing a blue denim shirt and blue jeans and identified a photograph taken by law enforcement of his shirt. He explained that he took his shirt off when he started running because he felt as if one of his hands was still bound.

The victim said Ms. Sproat took some time to answer her door, but she called 9-1-1 for him, and officers responded quickly thereafter. He left with law enforcement officers when they arrived to return to his home. The victim said that he eventually went to the hospital. He identified pictures, including some showing duct tape on his wrists and the legs of his pants. He also identified a photograph that depicted Defendant Shoffner leaning out of the window of the victim's truck. The victim reiterated that he did not know either perpetrator that came into his home that night. He testified that, after the fire, his home was completely gone, save the basement and a few corners of the house sticking up.

The victim recalled that, after the attack, law enforcement officers showed him pictures of suspects. He was unable to identify any of them with certainty from the photographs. He said, however, that when he saw the defendants in person, including Defendant Robinson's unusual physical shape, rather than in a photograph, he was able to positively identify them.

During cross-examination, the victim conceded that he had consumed a total of approximately twelve beers during the day leading to these events. He agreed that he fell asleep clothed because of the amount of beer he had consumed. The victim estimated that his assailants were in his home for approximately two hours. During this time, Defendant

Robinson did not wear a face-covering, and Defendant Duncan wore his for only the first hour. The victim got a good look at both of their faces when they first bound him with duct tape.

The victim agreed that, before Defendant Duncan lit the fire, he told him to get out of the house when the fire was lit because Defendant Duncan did not want to kill the victim. The victim agreed that he had testified during the preliminary hearing that he could not identify Defendant Duncan's face. He agreed that, during his interview the day after these events, he did not tell officers that Defendant Duncan shot the weapon while upstairs and only mentioned the shots downstairs. He further agreed that he had told officers that he overheard Defendant Duncan tell Defendant Robinson that the victim was dead after he seemed to intentionally miss him when shooting at him.

During further cross-examination, the victim described his 2001 black Ford Ranger with a camper top that was stolen and explained why he valued the truck at $9,000. The victim agreed that he never saw Defendant Shoffner at his house during this incident, and he never heard him speaking to Defendant Robinson during the phone call.

During redirect examination, the victim identified photographs of some electronics in his home. He also identified a photograph of a bruise on his chest. He said that, when Defendant Robinson attempted to shoot at him, he was an arm's length away from her, so he could see her clearly.

Kristine Sproat, the victim's niece, confirmed the victim's recount of his knocking on her door on the morning of April 11, 2016. When she answered the door, the victim, dressed only in pants, shook as he told her that his house was on fire and said, "They tried to kill me." Ms. Sproat called 9-1-1, and she, her husband, and their three children, waited with the victim until police arrived.

The 9-1-1 operator testified that she received the call related to this incident at 4:25 a.m. that indicated that someone had broken into the victim's home, tied him up, stolen his belongings, and set his house on fire. She dispatched officers, who arrived at the scene at 4:45 a.m. As the first officer on the scene, Deputy Jacob Kent, approached the victim's house, he saw that it was engulfed in flames. The deputy offered pictures that he had taken at the scene of the home, noting that he arrived shortly before firefighters.

Deputy Kent said he proceeded to the Ms. Sproat's home, where the victim was located. When the deputy saw the victim, he noted that the victim's hair was disheveled and that he had a notable injury to his forehead. Deputy Kent also saw what appeared to be duct tape around the victim's ankles. The deputy described the victim as visibly upset, saying that he had to calm down before recounting the events leading to the 9-1-1 call. He took the

victim back to his house. Deputy Kent saw what appeared to be a denim shirt or jacket with pieces of duct tape attached on the ground. Deputy Kent recalled that investigators from the CID, including Lieutenant Ken Miller, responded to the scene.

During cross-examination, Deputy Kent testified that the victim told him that he was assaulted by one male and one female, but that he was unable to identify either. The deputy testified he saw that the victim's wrists appeared red and some of the hair on his arms appeared to be missing. When he and the victim returned to the victim's house, the victim stated that his black Ford Ranger was missing. He also stated that his assailants had taken his wallet that contained his identification and debit card.

Ken Miller, a Lieutenant with Cheatham County Sheriff's Department CID, responded to the victim's home at around 5:30 or 6:00 a.m., by which time firefighters had gained control of the house fire. He spoke with Deputy Kent and then photographed the crime scene in an attempt to preserve any evidence that might be compromised by the firefighters. He observed and photographed the shirt laying on the ground upon which there appeared to be duct tape. He also photographed a gas can that was laying in the yard. Lieutenant Miller testified that he notified State Bomb and Arson Section of the Tennessee Bureau of Investigations (the Bomb and Arson Section") so that they could assist in this investigation.

The State asked Lieutenant Miller about a side issue regarding the chain of custody. Lieutenant Miller testified that he had recently been tasked with maintaining the integrity of the evidence room for the sheriff's office. He said that the sheriff's office housed evidence in three locations. One of those locations was downstairs in the same building as the sheriff's office and was secured by several locks because in it they stored weapons and narcotics. The second location was on the same level as the sheriff's office and only CID and supervisors had key card access to the room. The room was climate controlled and had a shelf for each detective, and each detective was responsible for the evidence in the room. Every item brought into the room was documented before being placed on the assigned detective's shelf. The third storage area was a container that was used for evidence that did not need to be climate controlled and was bulky, such as lawnmowers or weed eaters. Each of these areas was locked and secured.

Lieutenant Miller testified that the evidence in this case had been kept in the second storage room. He said that he checked the box out the morning before trial and checked the seal to ensure the integrity of the evidence.

During cross-examination, Lieutenant Miller agreed that the new protocol for evidence began five weeks before the trial and was not in place when the evidence in this case was gathered. Before the new protocol was in place, the evidence was generally stored

10

in each investigator's respective office unless it was narcotics or something with volatile fumes. He said that the whole office area was locked and, usually, each individual investigator's office was also locked.

In further cross-examination, the lieutenant said he was unsure where the evidence box was stored before the new protocol. The evidence would originally have been stored in Lieutenant Heflin's office. The lieutenant said that a property log tracked the box while it was in the sheriff's office's custody, but he did not have that sheet with him. He stated that he did not gather the shirt and gas can that he photographed because dispatch called him to another crime scene, and he was unsure who gathered them.

Lieutenant Shannon Helfin, who worked in the Narcotics Division of the Cheatham County Sheriff's Office, testified that he previously worked as a CID officer and it was in this capacity that he investigated this case. When he arrived at the crime scene on April 11, 2016, the fire department was still present and officers, including Agent Lamping from Bomb and Arson Section were on the scene. Deputy Kent was no longer at the scene, and Lieutenant Helflin met with Agent Lamping, who said she had interviewed the victim. She relayed to the lieutenant the victim's recounting of the events, and he suggested that they obtain the bank records showing at which ATMs the suspects had tried to use the bank card. He informed her that he would attempt to obtain video from the relevant ATMs.

Lieutenant Heflin said that he obtained subpoenas for the bank records and for the security footage at the respective ATMs. The lieutenant recalled that the victim's bank card had been used with an invalid PIN number seven or eight times, and the user was unable to withdraw cash. The timing of the transactions comported with the victim's recounting of the events.

Lieutenant Heflin sent Jeremy Ethridge, a sergeant with the Cheatham County Sheriff's Office, and Jason Hundley,[1] who was a sergeant with the Cheatham County Sheriff's Office at the time, to retrieve F&M bank statements for the victim's account and surveillance videos, including one from the Kangaroo Express. Sergeant Ethridge and Mr. Hundley viewed the video from the Kangaroo Express and saw a white male exit a vehicle and come inside the store, go directly to the ATM, and attempt to use the ATM. The man was wearing a black Adidas jacket or pullover and an Atlanta Braves baseball cap. The Kangaroo Express security system could not immediately copy the video, so the officers recorded their video with cell phones. Sergeant Ethridge gave both videos to Lieutenant Heflin. Lieutenant Heflin said that the Kangaroo Express video also showed another man, dressed in a Tennessee Titans jersey and blue jeans, driving up to the store in a blue Mercury

---

[1] Because Jason Hundley is no longer employed with law enforcement, we will refer to him as "Mr. Hundley."

Grand Marquis, that can . The video showed that man exiting the driver's side of the vehicle, coming into the store, and attempting to use the ATM card.

Lieutenant Helfin testified that videos from multiple locations matched photographs of Defendant Shoffner and the photograph from his driver's license. He learned that Defendant Shoffner, whom he identified from the ATM surveillance footage, resided with Defendant Robinson, and he sent Agent Ethridge and Mr. Hundley to her address on Cynthia Drive to make contact with her. When Agent Ethridge and Mr. Hundley arrived, both Defendant Shoffner, who was speaking on a cell phone, and Defendant Robinson were home with guests. Defendant Robinson gave the officers consent to search her home. Officers saw a black Adidas jacket lying on the floor by the couch and a grey Atlanta Braves hat on the couch, both of which appeared to match the jacket and cap worn in the photograph from the surveillance video from the ATM at the F&M Bank. Mr. Hundley noted that the Braves hat was unique in that it was not made in standard Braves colors, and had a sticker on the bill, which was "totally flat" and not curved. He gathered both items into an evidence bag that he secured in a vehicle until the officers were finished in the home.

Mr. Hundley recalled that, at some point while he was at the residence, the black phone being used by Defendant Shoffner when Mr. Hundley arrived was on the stove, and Mr. Hundley asked to whom it belonged. None of the four people present initially claimed the phone as theirs, so the officers took it into evidence until they could determine the phone's owner.

Lieutenant Heflin also went to the residence and spoke with Defendant Robinson, who said that one of the guests present came to her residence on April 10 to babysit Defendant Robinson's child during the night. Defendant Robinson said that she decided not to go to her planned destination, and instead stayed home. She said that she was at home at the time that the robbery and arson occurred. The lieutenant obtained cell phone numbers for each of the three defendants, and he obtained search warrants for their phones. The last four digits associated with each defendant's phone were: -8636 Defendant Shoffner, -7129 Defendant Robinson, -1387 Defendant Duncan.

Lieutenant Helfin then went to the Burkhart Trailer Park where he encountered Defendant Duncan driving the blue Mercury Marquis seen in the ATM video. He had a female passenger at the time. The lieutenant immediately detained Defendant Duncan and offered him *Miranda* warnings. The lieutenant recalled that it was raining heavily, so he patted Defendant Duncan down for officer safety. During the pat down, he recovered a white cell phone from his left jacket pocket, along with some "paperwork" belonging to the victim, which he immediately put into a plastic bag to protect it from the rain.

Defendant Duncan told Lieutenant Heflin that he had attempted to use a debit card at the Kangaroo Express earlier that morning. He consented to a search of his vehicle. In the vehicle the lieutenant found a red digital camera and a roll of Gorilla duct tape. After searching the vehicle, Lieutenant Heflin had the vehicle impounded, obtained a search warrant, and again searched the vehicle a few days later. In it, he found a black knit cap and a black cell phone.

Lieutenant Heflin said that, in July 2016, he received a call from a Tennessee Wildlife Resource Officer, who told him that he had found the victim's Ford Ranger in the woods less than a mile from where the lieutenant arrested Defendant Duncan. When he examined the vehicle, he saw that the interior was covered with some type of mold and fungus growth. In the vehicle, the lieutenant found three ATM receipts from declined transactions.

Lieutenant Heflin discussed the chain of custody for the evidence gathered in this case. He testified that all the evidence that he and other officers had collected and bagged at the scene was placed into his vehicle, and he transported it to back to his office. Similarly, all items taken from the scene of Defendant Duncan's arrest were bagged and placed into the lieutenant's vehicle and taken to his office where he placed all the items into one large box. The evidence remained in the lieutenant's office until he and Agent Lamping, who was the case agent, examined it. He described his office as in the CID, which is in a secure area protected by a keycode, accessible only by detectives or their supervisors. The lieutenant said that his personal office was accessible only to other detectives and Officer Marcy Jarrett who was the evidence custodian for the department. The lieutenant said that the box remained under his care, custody, and control at all times when it was in his office and up until he placed it into the evidence room. He agreed that some of the evidence gathered did not have the relevant information filled out on the bags. He said that some of the evidence gathered at the scene was handed to him but not properly bagged. All the evidence, however, was placed and kept in the box, which was later sealed. He noted that the bag containing the evidence he found on Defendant Duncan, namely the documentation belonging to the victim in the defendant's pocket, was not properly sealed. The lieutenant placed the documentation in the large box, which he kept in his office, until it was sealed and taken to the property room.

The lieutenant noted that, when they went through the evidence, he saw pictures of the victim's family on the red digital camera found in Defendant Duncan's vehicle. Upon further inspection of the receipts from the declined transactions, he noted that one of the receipts was from a USAA bank located on Dover Road in Clarksville. Looking at the declined receipts found in the victim's Ranger, the lieutenant said that one receipt was from 4/11/2016 at 1:53 a.m., at 2658 Madison Street, and it stated that the wrong PIN number had been entered. Another receipt was from 4/11/2016 at 2:59 a.m., at Heritage Bank located at

13

2185 Madison Street in Clarksville. The lieutenant testified that he gave the cell phones that he obtained through his investigation to Agent Lamping for further analysis.

During cross-examination, Lieutenant Heflin testified that Defendant Duncan told him that he had received the ATM card that he used on the morning of April 11, 2016, around the time that he used it. The lieutenant agreed that he first made contact with Defendant Duncan that same day after daylight, around 7:00 a.m. The lieutenant agreed that there was a discrepancy in the log related to the cell phones, which stated that they were recovered on April 14, 2016, when he actually collected them on April 11, 2016.

Lieutenant Heflin agreed that the bag containing the cell phones may not have been properly sealed, but he did not know who improperly left it open. It further appeared that one of the cellphones was placed improperly in a bag with another cellphone. Finally, a phone charger that should have been in the bag was missing.

During further cross-examination, Lieutenant Heflin said that Agent Lamping was the lead investigator in this case but was not listed on the crime scene log. He agreed that Agents Ethridge and Mr. Hundley had not followed proper evidence collection procedure, and he could not explain their reasoning, other than saying it seemed like an oversight.

Marion Pack, who was the custodian of records for Community Bank and Trust, testified that the victim's debit card was used on April 11, at 1:49 a.m. to make an inquiry via an ATM at 2698 Madison Street in Clarksville, Tennessee. The response code indicated that the invalid PIN number had been entered. The card was used several times, both to inquire into the checking account and also to attempt to withdraw money, but the transactions were declined based upon the invalid PIN number. The card was used at a different location at 2:50 a.m. in Ashland City, Tennessee, again in an attempt to withdraw money, which again the bank declined because of the invalid PIN number. At 2:59 a.m., the victim's card was attempted to be used to withdraw money at an ATM located at 2185 Madison Street. The transaction was declined based on invalid PIN number. At 7:17 a.m., the victim's card was attempted to be used to inquire about the victim's checking account from an ATM at 523 Dover Road in Clarksville. The inquiry was declined based upon an invalid PIN. A minute later, the card was used in an attempt to withdraw $200, which was again declined.

The State offered, and the trial court admitted, two surveillance videos from the night in question. Trey Vincent, a fraud examiner with F&M Bank, identified a video from the ATM located at 2698 Madison Street from April 11, 2016 at 1:50 a.m. Tammy Bryant, a manager at the relevant Kangaroo Express location, identified surveillance video from her store at 7:18 a.m. on the morning in question. The State played the videos for the jury.

14

Special Agent Amy Lamping, who worked in the Bomb and Arson Section at the time of these events, testified that she first went to the hospital to interview the victim and get his consent to access the fire scene. She met with the victim at around 9:00 a.m. and found him still shaken by the events of previous evening. She noted his visible injuries, including a gash to his forehead and bruised hands. After interviewing the victim, Agent Lamping went to the victim's home on Beech Grove Road.

At the victim's home, which was also the fire scene, she encountered Agent Michael Zimmerman and Lieutenant Heflin. She said there were no other officers on the scene, which was not unusual for bomb and arson investigations, as the area was taped off with crime scene tape and there was little left of value. Agent Lamping said that Agent Zimmerman was present at the scene with his K-9, accelerant detecting partner, Scooter. The two were there to confirm or discredit the victim's story that his assailants used an accelerant to start the fire.

Agent Zimmermann confirmed this and testified that Scooter was a yellow Labrador retriever trained to detect otherwise odorless accelerant. Agent Zimmermann and Scooter reported to this crime scene, at the request of Agent Lamping. The two arrived on the scene at 9:30 or 10:00 a.m. From the scene, Agent Zimmermann determined that there was a "heavy fuel load" and the structure was allowed to burn for an extended period of time. There was also excessive water damage, which proved that the fire required "quite a bit of water" to extinguish it. At the scene, Scooter positively identified that there was accelerant by the front door of the home, and on the front steps. Agent Zimmermann gathered samples of each of the areas where Scooter alerted and placed the samples into clean cans. Agent Lamping then took the cans to the Tennessee Bureau of Investigations ("TBI") crime laboratory to be tested.

Agent Lamping said that, once the K-9 officer's dog indicated accelerant, she took a picture of the area to document it and then gathered a sample. She placed the sample in an unused empty paint can, which she sealed and labeled to take to the Tennessee Bureau of Investigation ("TBI) Crime Laboratory for analysis.

Agent Lamping explained her presence at Defendant Robinson's house on Cynthia Drive, saying that she and other officers went there after having identified suspects from the ATM surveillance videos. She said that they arrived during the evening of April 11, 2016. While she was speaking with Defendant Robinson in her bedroom, she noticed some electronic equipment that appeared to be video surveillance equipment. She asked Defendant Robinson if the equipment belonged to her, and Defendant Robinson said that it did not. Agent Lamping asked if she could take the equipment back with her, and Defendant Robinson agreed, even providing Agent Lamping with a box to use to transport the equipment.

Agent Lamping said that she and Lieutenant Heflin left the Cynthia Drive address and went to the Burkhart Trailer Park looking for a blue Mercury Marquis that had been identified in the Kangaroo Express surveillance video. They were trying to locate Defendant Duncan who appeared in the video wearing a Tennessee Titans jersey and attempting to access the victim's bank account. When they arrived, Defendant Duncan agreed that he had attempted to use the victim's debit card. He provided the officers consent to search his vehicle, and they found a red digital camera that contained photographs of the victim and his family and a roll of black Gorilla duct tape. On Defendant Duncan's person, the officers found a white cell phone. Agent Lamping testified that she placed a sticker on the cell phone and that she labeled the bag in which the phone was placed. She noted that the phone had later been put into the wrong evidence bag.

Agent Lamping said that the officers had the vehicle towed to a law enforcement lot. They obtained a search warrant and searched the vehicle again on April 14, 2016. During that search, the officers found a receipt from a USAA bank located on Dover Road. It showed that an ATM card was used on April 11, 2016, at 7:19 a.m., and that the transaction was declined. Agent Lamping said that, during this second search, officers also found a dark-colored ski mask and a black cell phone. Agent Lamping noted that the black cell phone was also in the wrong evidence bag, and it appeared that the two phones were switched and each placed in the other's respective evidence bag. She, however, expressed certainty that officers found the white cell phone on Defendant Duncan's person and the black cell phone in the Defendant's car. Agent Lamping said all the evidence was placed in a box and maintained by Lieutenant Heflin, other than the samples sent to the TBI. Agent Lamping testified that it was her writing on the evidence that was in the box maintained by the lieutenant because they were together when they gathered the evidence.

Agent Lamping said that she took the cell phones involved in this case to Detective Scott Levassur at the Dickson County Sheriff's Office for further analysis. She said that the cell phones were in their correct evidence bags when she picked them up. Agent Lamping received the evidence and the cell phones back from Detective Levassur on May 17, 2016. She gave the phones back to Lieutenant Heflin.

During cross-examination, Agent Lamping testified that the lab results of the samples taken from Scooter's indications all returned negative for accelerant. She said that, after Defendant Duncan admitted to using the victim's debit card, officers placed him under arrest. Agent Lamping said that she was certain of what items she found in the car because she photographed them before placing them into evidence. The agent agreed that she failed to send off the remnants of black duct tape for further testing. She agreed that the cell phone charger was missing from the evidence bag, despite a note that it contained a cell phone

charger. The agent agreed that there was no crime scene tape at the scene of the victim's home but that there should have been.

Scott Levasseur, a lieutenant in the Cyber Crime Unit for the Dickson County Sheriff's Office, testified that he did what is referred to as a "data dump" on the phones in this case. That term referred to the process of him using software to extract data on the phone, which he then placed into an electronic format for investigators to look at.

Lieutenant Levasseur said that he examined three phones in this case pursuant to the search warrant. For each of them, he extracted the data and burned the data to a disk for the investigators. Each phone was examined separately, and the date extracted and saved separately. The lieutenant identified the phones and the data for each of the phones.

Looking at the data dump for the victim's phone that ended in the number -9456,[2] he testified that the call log showed that there was a phone call to a contact listed as "Bank" on April 11, 2016, at 8:41 p.m. The call lasted two minutes and forty-one seconds. There were three additional calls to the contact "Bank" and then multiple calls to a phone number ending in -0029, which had no contact information associated with it. There were then six more calls to the contact "Bank." At 3:06 a.m. on April 11, 2016, there was a call to a phone number that ended in -4748.

Looking at the data dump for Defendant Shoffner's phone, Lieutenant Levasseur testified that the call log for the phone showed that it received a call from a contact listed as "Ariel," last four digits matching Defendant Robinson's phone, at 8:45 p.m. on April 10, 2016. That evening, the phone received and made calls to the contact "Chris," last four digits matching the phone for Defendant Duncan, and to a 1-800 number. Between 12:57 a.m. and 4:23 a.m., the phone received multiple calls from the phones of defendants Robinson and Duncan, including four missed calls from Defendant Duncan and one from Defendant Robinson between 1:10 a.m. and 6:50 a.m. There were also calls to and from phone number ending in -2919, which had no contact name associated with it. At 7:27 a.m. that same day, the phone received a seven-second call from Defendant Duncan's phone. The lieutenant said that this phone contacted the phones of defendant Robinson and Duncan more than any other contacts. The lieutenant noted that there appeared to be an email account linked with the phone, which showed the user name as "timshoffner4."

During cross-examination, Lieutenant Levasseur agreed that the logs did not show who was using the phone at the time the phone was in use.

---

[2] This phone was the victim's phone that law enforcement officers found in Defendant Duncan's person.

Thomas Bell, a criminal intelligence analysist with the Regional Organized Crime Information Center ("ROCIC"), testified that he analyzed the cell phone data in this case. His analysis included the longitude and latitude information that was embedded in the calls sent and received from the cell phones in this case. Mr. Bell explained that the investigating officers in this case provided him the cell phone numbers for three cell phones. He then inputted the data from the cell phone companies about these phones into a software program that filtered that information to a date span given by the investigating officers.

Mr. Bell identified data from the cell phones associated with all three defendants. The mapping of the data from the phones showed that between 10:00 and 10:30 p.m. on April 10, 2016, all three phones were in use in the Clarksville area. The following morning, the morning of April 11, 2016, at around 1:00 a.m. the phones of defendants Duncan and Shoffner were using a tower in the vicinity of the victim's home in Ashland City. Thirty minutes later, Defendant Shoffner's phone was using a tower located north of the victim's house, and the phones of defendants Duncan and Robinson were using a tower to the southwest of the victim's house.

Mr. Bell testified that over the next two hours, Defendant Shoffner's phone indicated that he was using different towers, some by the F&M Bank in Clarksville. During that same time, the phones of defendants Duncan and Robinson continued to be in use, pinging off the tower that was in the vicinity of the victim's house. Around 4:15 a.m., Defendant Shoffner's phone remained in Clarksville, while the phones of defendants Duncan and Robinson remained in use near the victim's house. Twenty minutes later, the phones of defendants Duncan and Robinson engaged towers just southeast of Clarksville, and, by 5:00 a.m., the phones were utilizing towers that were the same as the ones used at 10:00 a.m. the previous evening.

At 7:20 a.m. Defendant Duncan's phone engaged a tower to the northeast of the Kangaroo Express, where he attempted to withdraw money using the victim's ATM card. The phone data showed that Defendant Shoffner received two calls from Defendant Duncan around that time, one at 7:11 a.m. and one at 7:20 a.m.

Marcy Jarrett testified that she was the evidence custodian for the sheriff's department. For the approximately four years leading to the trial, and as far back as these events, her responsibilities included storing and checking evidence in and out as needed. Officer Jarrett described her procedures for receiving and storing evidence. She described the three areas in which they kept evidence and the procedures to access that evidence.

Officer Jarrett identified the box of evidence in this case. She received the box from Lieutenant Heflin, sealed it, and wrote the victim's name and the incident number on the box. She explained that she and the officers know where the evidence is kept because their

"Tyler System," a computer tracking system that logs evidence into and out of different storage areas. The box was originally housed in the same room as the narcotics. Then, because of overcrowding, it was moved to the storage container. When the CID property room was incepted, the box was placed there, where it remained until trial. The box had been checked out "a few times," but she checked it back in and resealed it each time.

Based upon this evidence, the jury convicted the defendants of the lesser-included offense of attempted second degree murder, the charged offenses of aggravated arson, especially aggravated kidnapping, aggravated robbery, and the lesser-included offense of theft of property valued at more than $2,500 but less than $10,000.

## D. Sentencing Hearing

At the sentencing hearing, the victim identified photographs of his house before and after the fire and of himself in the hospital. He recounted how he had lost everything, his history, his documents, his money. During the attempt to clean up what remained of his home to rebuild, there was another fire, and he got second degree burns to his arms and face. Later, as his house was being rebuilt by a construction company, someone tore down part of the rebuilt porch and started another fire.

The victim said he had since rebuilt his house using insurance proceeds. The victim said that he had to purchase a new truck to replace the one that the defendants stole and that he never received back the stolen jewelry. He described these events as "devastating." The victim reminded the trial court that Defendant Duncan could have killed him but did not.

During cross-examination, the victim said that he believed that Defendant Robinson was in charge during the attack. He further stated that he believed that all of the defendants should be given a second chance.

Teresa Geas, the probation and parole officer who did the presentence report in this case, testified that Defendant Duncan was twenty-seven years old at the time of sentencing. Defendant Duncan had several prior convictions, including initiation of a process to manufacture methamphetamine in 2015, an offense for which he received an eight-year sentence. Defendant Duncan had also previously been convicted of burglary in 2017, with a four-year sentence; theft in 2015, with a two-year sentence, theft in 2014, with a four-year sentence; multiple theft convictions, a reckless endangerment with a deadly weapon, and multiple burglary convictions, all in 2012. Officer Geas found a total of thirteen felony convictions, including the felonies in this case. The felonies in this case were committed while Defendant Duncan was on community corrections.

While incarcerated, Defendant Duncan had been disciplined on multiple occasions. He tested positive on a drug screen on September 17, 2018, possessed a deadly weapon (three homemade knives) on February 7, 2019, refused a cell assignment in March 6, 2019, possessed a deadly weapon (three homemade knives) on June 10, 2019, and engaged in a fight on June 26, 2019. There was an "intelligence alert" associated with Defendant Duncan to warn staff that he was a known maker or manufacturer or holder of homemade weapons and knives and, as such, should be closely monitored.

Defendant Duncan self-reported his physical health as fair but stated that his mental health was "poor" due to depression, stress, and being suicidal. The Defendant reported that he consumed alcohol, and in 2013 began using methamphetamine "daily." In 2017, he began using heroin and PCP. He reported that, in 2012, he used acid "a lot." She noted that this offense occurred in 2016, and that the Defendant was incarcerated in 2017, so he would have first used PCP while incarcerated, if his self-reporting was accurate. The Defendant also reported abusing prescription drugs in 2008. On the questionnaire, Defendant Duncan reported that he could not pass a drug screen, despite the fact that he was incarcerated.

Defendant Duncan also reported not having a father. He said his mother was a single mother and had a hard time paying their bills. Therefore, they were homeless intermittently throughout his childhood.

Officer Geas also prepared the presentence report for Defendant Robinson, who was twenty-eight years old at the time of sentencing. Defendant Robinson declined to offer her version of the events surrounding her conviction. Defendant Robinson had no prior convictions, but she did receive multiple disciplinary actions while incarcerated that resulted in punishment, such as fighting, being out of place, hoarding medication, and property destruction. She had also pleaded guilty in General Sessions Court to a vandalism that occurred while incarcerated . Defendant Robinson's testing indicated that she scored "overall high for violence, property and drug use, with high target risk areas for attitudes, and behaviors, and aggression, and mental health."

Officer Geas said that Defendant Robinson reported substance abuse issues by saying that, at different times, she used marijuana cocaine, and methamphetamine, and she reported attending a treatment program. She also reported that she had sold drugs to get more drugs. Defendant Robinson said that, along with seeking substance abuse treatment, she had also sought counseling for mental health issues. The officer said the Defendant also indicated she had attempted suicide while incarcerated.

Defendant Robinson reported that she had graduated high school, attended one year of community college, and had two children, neither of whom were in her custody.

Defendant Robinson said her children's father was abusive and a gang member, being affiliated with the Vice Lords.

During cross-examination, Officer Geas testified that she had not gathered information about Defendant Robinson's medical reports while incarcerated, so she was unsure whether Defendant Robinson was medicated at the time that she was disciplined.

During redirect, Officer Geas discussed Defendant Shoffner's presentence report. She stated that he was twenty-seven years old and associated with the gang the Vice Lords. Defendant Shoffner's prior record indicated that he had been convicted for aggravated assault in January 2019 for stabbing another inmate. In March 2016, he was convicted of evading arrest and flight, and in 2015, he was convicted of multiple assaults. That same year, he was convicted of aggravated robbery, especially aggravated robbery, aggravated burglary, and reckless endangerment. In 2011, Defendant Shoffner was convicted of multiple thefts, burglary, and aggravated burglary. Along with numerous other convictions, Defendant Shoffner had been convicted in 2009 of reckless endangerment as a lesser-included offense of the charged offense of attempted second degree murder. Officer Geas offered certified copies of Defendant Shoffner's fifteen prior felony convictions.

Defendant Shoffner had also received multiple disciplinary actions while incarcerated. He had refus ed to take or altered a drug screen, assaulted another inmate, had a positive drug screen, threatened group activity, possessed deadly weapons (three knives), and engaged in fighting.

Defendant Shoffner reported that he had not graduated from high school. He stated that his mental and physical health were "excellent" and said he had never attended any sort of treatment program. The Defendant admitted using alcohol but denied using any illegal drugs.

Officer Geas confirmed that Defendant Shoffner was on bond at the time of the April 2016 events.

Defendant Duncan offered the testimony of his mother, Melissa Riester. Ms. Riester testified that she was fifteen years old when Defendant Duncan was born and that she lived with her father, who was intermittently abusive to Defendant Duncan. She recalled multiple situations where police intervened to assist Defendant Duncan. She recounted how Defendant Duncan had been placed in special education classes in school because he was behind and had some learning disabilities. This caused him to be bullied. Eventually, the State took custody of Defendant Duncan. Ms. Riester recalled that Defendant Duncan's father did not participate in his care, and, at one point, said hurtful things to Defendant Duncan about his being a mistake.

Ms. Riester testified that she was in multiple relationships that were abusive, and that one of her boyfriends physically assaulted Defendant Duncan, breaking his occipital bone in four places. She said this assault "changed" Defendant Duncan, and that he began using and became addicted to drugs. This addiction contributed to his criminal behavior. Ms. Riester said that Defendant Duncan was not a violent person and that these actions were out of character for him.

Defendant Robinson's mother, Lorene Robinson, testified and described her daughter as "[s]weet, kind, [and] very giving." She said that Defendant Robinson had been the victim of domestic violence, the father of her children having raped her, and held her against her will. Mrs. Robinson said that she intervened and took Defendant Robinson to Chicago to get away from him. Her assailant was criminally charged, but Defendant Robinson was arrested on the charges in this case before the domestic case went to trial.

Mrs. Robinson discussed Defendant Robinson's childhood, saying that she struggled in school and suffered from ADD. She said that she had trouble making friends, and Mrs. Robinson worked long hours and so was not there to care for her. Mrs. Robinson confirmed that Defendant Robinson participated in substance abuse treatment and subsequent counseling.

Mrs. Robinson said that Defendant Robinson was a single mother who had little support and was in a violent relationship. She recalled that Defendant Robinson began using drugs at a young age.

Tabitha Tackett testified that she worked for Legal Aid Society as a victim's advocate in domestic violence cases and that Defendant Robinson had come to her office for assistance. Ms. Tackett assisted Defendant Robinson in obtaining orders of protection against Defendant Robinson's ex-boyfriend.

Natasha Martin from the Cheatham County Jail testified that she acted as the jail's Health Services Administrator, meaning she was a nurse at the jail. Reviewing Defendant Robinson's records, she testified that Defendant Robinson was being given Paxil, which is a "mood stabilizer." She noted that the records indicated that Defendant Robinson had been transferred to Middle Tennessee Mental Health because she stated that she was going to commit suicide. The doctors at the mental health facility additionally prescribed the Defendant, a "high dose" of Depakote, a medication for mood disorders, Haldol, an anti-psychotic medication, Cogentin, a medication to decrease the side effects of the Haldol, Prazosin, a blood pressure medication, and Celexa, an anti-depressant. All of these medications had side effects, including dizziness, blurred vision, nausea, vomiting, in some cases insomnia, anxiety, and suicidal ideation.

Ms. Martin said that Defendant Robinson was transported to the mental health facility a second time, two weeks after her first trip. She remained on the same medications when she returned.

Defendant Robinson asked the court for leniency so that she could see her kids again one day.

The trial court made findings of fact, as will be enumerated below, and it sentenced Defendant Robinson to an effective sentence of thirty-seven years, Defendant Duncan to an effective sentence of seventy-eight years, and Defendant Shoffner to an effective sentence of 162 years in prison.

It is from these judgments that the defendants now appeal.

## II. Analysis

On appeal, Defendant Shoffner contends that: (1) the trial court erred when it denied his motion to dismiss because the indictment did not adequately charge him with the offense of attempted first-degree murder. Defendant Duncan contends that: (2) the trial court improperly denied his motion to suppress. Defendants Robinson and Shoffner both contend that: (3) the State delayed their viewing of the evidence before trial. Defendants Duncan and Shoffner contend that: (4) the State failed to establish a sufficient chain of custody for the physical evidence; (5) the trial court improperly admitted cell phone tower maps; and (6) the trial court erred when it did not instruct the jury on facilitation. Defendant Robinson contends that: (7) the trial court erred when it denied her impeachment request. All the defendants contend that: (8) the evidence is insufficient to sustain their convictions; and (9) the trial court erred when it sentenced them.

### A. Motion to Dismiss

Defendant Shoffner contends that the trial court erred when it denied his motion to dismiss because the indictment did not adequately charge him with the offense of attempted first-degree murder. He asserts that the indictment did not charge an offense in Count 1, attempted first degree murder, because it referenced the criminal attempt statute and not the statute for murder, citing Tennessee Code Annotated section 39-12-101 instead of 39-13-202. Further, he asserts that the indictment did not use the correct charging language and used the language "knowingly" instead of "intentionally" and incorrectly used the obsolete requirement of "deliberation." The State concedes that the indictment was not properly drafted but states that it was sufficient to put Defendant Shoffner on notice that he was charged with attempted first-degree murder. The State points out that the indictment states

that the defendant, with premeditation, attempted to kill the alleged victim and that the crime was a Class A felony. The State notes that the only type of attempted homicide that requires premeditation and is a Class A felony is attempted first degree murder, so therefore Defendant Duncan was on notice.

Challenges to the validity of an indictment present questions of law and, thus, are reviewed de novo. *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997). According to the United States Constitution and the Tennessee Constitution, an indictment must provide the accused with "the nature and cause of the accusation" being made against him/her. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Pursuant to Tennessee Code Annotated section 40-13-202 (2019), an indictment must present the facts in such a way that "enable[s] a person of common understanding to know what is intended." This Court has held that "an indictment is valid if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." *Hill*, 954 S.W.2d at 727 (citing *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991); *VanArsdall v. State*, 919 S.W.2d 626, 630 (Tenn. Crim. App. 1995); *State v. Smith*, 612 S.W.2d 493, 497 (Tenn. Crim. App. 1980)).

Indictments are reviewed from an "enlightened standpoint of common sense and right reason rather than from the narrow standpoint of petty preciosity, pettifogging, technicality or hair splitting fault finding." *Hill*, 954 S.W.2d at 728 (quoting *United States v. Purvis*, 580 F.2d 853, 857 (5th Cir. 1978)). In a number of cases since *Hill*, this Court has held that an indictment meets statutory and constitutional requirements if it "achieve[s] the overriding purpose of [providing] notice to the accused," noting the Court's "relaxation of common law pleading requirements and its reluctance to elevate form over substance." *State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000); *see also Sledge*, 15 S.W.3d at 95; *Crittenden v. State*, 978 S.W.2d 929, 931 (Tenn. 1998); *Ruff v. State*, 978 S.W.2d 95, 99 (Tenn. 1998).

For convenience, we repeat again the indicted charge of attempted first degree murder:

> The Grand Jurors for the State of Tennessee, duly elected, impaneled, sworn, and charged to inquire, in and for the body of the County of Cheatham, in the State aforesaid, upon their oaths, present: That ARIEL K. ROBINSON, CHRISTOPHER A. DUNCAN AND TIM SHOFFNER heretofore, to wit: on or about April 11, 2016, and prior to the finding of this Indictment, in the county of Cheatham aforesaid, then and there, did unlawfully, knowingly, deliberately, and feloniously and with premeditation, attempt to kill Frank S. Burnette, in violation of T.C.A. 39-12-101, a Class A Felony, all of which is against the peace and dignity of the State of Tennessee.

First degree murder, which is found at Tennessee Code Annotated section 39-13-202(a)(1) and is defined as "[a] premeditated and intentional killing of another." Criminal attempt is defined as occurring when a person "acting with the kind of culpability otherwise required for the offense" engages in "an act or acts in furtherance of the attempted crime." Tennessee Code Annotated section 39-12-101.

As Defendant Shoffner correctly points out, the indictment omits the language "intentionally" and includes the language "knowingly" and "deliberately." Further, the indictment cites the criminal attempt statute, Tennessee Code Annotated section 39-12-101, but it omits reference to the relevant first-degree murder statute.

Charging errors such as these, while a reflection of the overwhelming nature of a prosecutor's duties, are unnecessary, and we are in agreement with the trial court that each office should address internally its procedures to ensure the accuracy of its indictments. That said, the question before us today is whether the indictment in this case was fatally flawed. We conclude that it was not.

In *State v. Marshall*, 870 S.W.2d 532, 536 (Tenn. Crim. App. 1993), this court held that the failure to specifically allege an element of the offense is not fatal "if the elements are necessarily implied from the allegations made." (citing *Hagner v. United State*, 285 U.S. 427 (1932)). "The allegation that the defendant attempted to kill the victim necessarily implies that he intended to kill her." *State v. Michael K. Christian*, No. 03C01-9609-CR-00336, 1998 WL 125562, at *5 (Tenn. Crim. App., at Knoxville, Mar. 23, 1998), *perm. app. denied* (Tenn. Jan. 19, 1999). Also, a "premeditated act" is an act done "after the exercise of reflection and judgment." T.C.A. § 39-13-201(2) (2018). "The element of premeditation requires a previously formed design or intent to kill." *State v. West*, 844 S.W.2d 144, 147 (Tenn. 1992) (emphasis added); *see also* T.C.A. § 39-13-202(d) (2018) (amending the statutory definition of premeditation to provide "it means that the intent to kill must have been formed prior to the act itself"). Accordingly, the indictment necessarily implies the attempted homicide was intentional.

The additional language of "deliberate" does not invalidate the indictment. If anything, the additional element of "deliberately" created a higher burden for the State to overcome in order to secure an indictment against the defendant for first degree murder. Accordingly, any error in the grand jury process caused by the addition of "deliberately" in the indictment ran to the defendant's benefit, not his detriment.

Further, the indictment clearly states that the alleged offense occurred with "premeditation" and was a Class A felony. The only attempted homicide offense that has an element of premeditation and is a Class A felony is attempted first-degree murder. We

conclude that the indictment provided to the defendants sufficient notice of his charge for attempted first-degree murder and provided to the trial court an adequate basis to enter a proper judgment. *Hill*, 954 S.W.2d at 727. To hold otherwise would require us to engage in the very "pettifogging, technicality or hair splitting" that our supreme court has noted that it seeks to avoid. *See id.* at 728. Therefore, we hold that Defendant Shoffner's indictment for attempted first-degree murder was sufficient to permit Defendant Shoffner to be tried on that charge.

### B. Motion to Suppress

Defendant Duncan contends that he was seized and then questioned by law enforcement officers without being advised of his rights pursuant to *Miranda.* He further contends that he did not consent to the search of his vehicle. The crux of his argument relies upon an assertion that the trial court erred when it found credible the law enforcement officers' testimony that they did, in fact, give Defendant Duncan *Miranda* warnings before speaking with him and that he provided them consent to search. The State counters that the trial court found the law enforcement officers credible and that such finding is conclusive on appeal. We agree with the State.

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. *State v. Meeks*, 262 S.W.3d 710, 722 (Tenn. 2008) (citing *State v. Scarborough*, 201 S.W.3d 607, 615 (Tenn. 2006)). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." *Id.* (citing *State v. Berrios*, 235 S.W.3d 99, 104 (Tenn. 2007)). Conversely, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. *Id.* (citing *State v. Hayes*, 188 S.W.3d 505, 510 (Tenn. 2006)). In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The United States and Tennessee Constitutions protect a suspect from "being compelled to give evidence against himself." *State v. Berry*, 141 S.W.3d 549, 576 (Tenn. 2004) (citing U.S. Const. amend. V; Tenn. Const. art. I, § 9); *see also State v. Turner*, 305 S.W.3d 508, 515 (Tenn. 2010). When a defendant is in custody and subject to interrogation, the police must first inform him of his Fifth Amendment rights in order for his confession

to be admissible as substantive evidence in the trial of the matter. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The trial court may not admit any statement elicited from a defendant through police-initiated custodial interrogation unless the defendant was warned of his Fifth Amendment rights and knowingly waived those rights. *Id.*

Pursuant to *Miranda*, law enforcement officers are required to warn a person prior to custodial interrogation that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. *Id.* at 479. A defendant may waive his rights under *Miranda* if such waiver is voluntary, knowing, and intelligent. *State v. Echols*, 382 S.W.3d 266, 280 (Tenn. 2012). The State bears the burden of proving by a preponderance of the evidence that the defendant waived his *Miranda* rights. *State v. Climer*, 400 S.W.3d 537, 564 (Tenn. 2013) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010)). Certain factors apply in the determination of whether a waiver of *Miranda* rights qualifies as voluntary, knowing, and intelligent: the age and background of the defendant; his education and intelligence level; his reading and writing skills; his demeanor and responsiveness to questions; his prior experience with the police; any mental disease or disorder; any intoxication at the time of the waiver; and the manner, detail, and language in which the *Miranda* rights were explained. *Echols*, 382 S.W.3d at 280-81 (citing *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000); *State v. Callahan*, 979 S.W.2d 577, 583 (Tenn. 1998)).

As the trial court noted in this case, the issue presented was one of the credibility of the law enforcement officers, all of whom said that Defendant Duncan was given *Miranda* warnings, against Defendant Duncan's credibility, who said that they did not. Importantly, Defendant Duncan does not assert that he did not understand the warnings or that he did not knowingly waive his rights but simply that the law enforcement officers never gave him *Miranda* warnings. Pursuant to our standard of review, questions of credibility are entrusted to the trial judge, who found the law enforcement officers credible and gave little to no credibility to the testimony of Defendant Duncan. As such, we conclude that the State proved by a preponderance of the evidence that law enforcement officers provided Defendant Duncan his *Miranda* warnings and that the statements he made were subsequent to him being informed of his rights.

We further similarly rely upon the trial court's credibility determination with regard to Defendant Duncan's consent to search his vehicle. Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." *State v. Talley*, 307 S.W.3d at 723, 729 (Tenn. 2010) (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7). The search and seizure provisions of the federal and state constitutions are "identical in intent and purpose." *State v. Christensen*, 517 S.W.3d

60, 68 (Tenn. 2017) (quoting *Sneed v. State*, 423 S.W.2d 857, 860 (1968)). "Under both constitutional guarantees, reasonableness is 'the ultimate touchstone.'" *State v. Stanfield*, 554 S.W.3d 1, 9 (Tenn. 2018) (citing *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006); *State v. McCormick*, 494 S.W.3d 673, 679 (Tenn. 2016)). Whether a particular search meets the reasonableness standard "is judged by balancing its intrusion on the individual's . . . interests against its promotion of legitimate governmental interests.'" *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 619 (1989) (quoting *Delaware v. Prouse*, 440 U.S. 648, 654 (1979)).

A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing. *Chandler v. Miller*, 520 U.S. 305, 308 (1997). Determining whether a particular search is "unreasonable" and, therefore, a violation of the rights guaranteed by the Fourth Amendment "depends upon all of the circumstances surrounding the search . . . and the nature of the search . . . itself." *State v. Turner*, 297 S.W.3d 155, 160 (Tenn. 2009) (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985)). "While a search is presumptively reasonable when conducted on the basis of probable cause and with a warrant, warrantless searches and seizures are presumptively unreasonable regardless of whether law enforcement actually had probable cause to conduct a search." *State v. Hamm*, 589 S.W.3d 765, 771 (Tenn. 2019) (citing *McCormick*, 494 S.W.3d at 678-79). This is merely a presumption, however, and there are several exceptions to the probable cause and warrant requirements, including investigatory detentions, searches incident to a valid arrest, seizure of items in plain view, exigent circumstances, consent searches, vehicle searches, container searches, and searches in which the special needs of law enforcement make the probable cause requirement impracticable. *Tamez v. City of San Marcos*, 118 F.3d 1085, 1093 (5th Cir. 1997) (citing *David Orlin, et al., Warrantless Searches and Seizures*, 85 Geo. L.J. 847, 847 (1997) (collecting cases)).

The consent exception to the warrant requirement applies when a person voluntarily consents to a search. *State v. Reynolds*, 504 S.W.3d 283, 306-07 (Tenn. 2016) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *State v. Berrios*, 235 S.W.3d 99, 109 (Tenn. 2007)). The State has the burden to prove that "consent was, in fact, freely and voluntarily given." *Schneckloth*, 412 U.S. at 222, (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). "The pertinent question is . . . whether the [individual's] act of consenting is the product of an essentially free and unconstrained choice. If the [individual's] will was overborne and his or her capacity for self-determination critically impaired, due process is offended." *State v. Cox*, 171 S.W.3d 174, 185 (Tenn. 2005) (citing *Schneckloth*, 412 U.S. at 225-26); *see also Berrios*, 235 S.W.3d at 109. Answering this question of fact requires consideration of the totality of the circumstances in each case. *Schneckloth*, 412 U.S. at 227; *Cox*, 171 S.W.3d at 184, 186. Relevant circumstances include the time and place of the encounter, level of hostility, if any, between the police and the individual, and the number of officers present, as well as the individual's "age, education,

intelligence, knowledge, maturity, sophistication, experience, prior contact with law enforcement personnel, and prior cooperation or refusal to cooperate with law enforcement personnel." *Cox*, 171 S.W.3d at 185 (internal quotation marks omitted).

About the consent to search in this case, the trial court, considering the totality of the circumstances, found that Defendant Duncan's consent was voluntary. It noted that Defendant Duncan was twenty-six, had a criminal history involving several interactions with law enforcement, had no type of physical or mental disability, and that the officers had credibility testified that they did not have their weapons drawn when Defendant Duncan gave consent. The trial court found that Defendant Duncan's consent was voluntary, in that it was unequivocal, specific, intelligently given, and uncontaminated by any duress or coercion. The evidence does not preponderate against the trial court's findings. Defendant Duncan has not offered any evidence that would refute the trial court's findings, other than his assertions that the testimony of the law enforcement officers was not credible. This is not an adequate basis requiring reversal. As such, he is not entitled to relief on this issue.

## C. Viewing Evidence

Defendant Robinson contends that the State violated her due process rights and Article 1 section 8 of the Tennessee Constitution, which affords every defendant a fair trial, by preventing her from viewing the evidence until four days before trial. Defendant Robinson's attorney concedes that she was invited on two previous occasions to review the evidence, but states that she was unable to do so because of other obligations. She asserts that, based upon the evidence she viewed, she filed a motion to continue, which the trial court improperly denied. The State counters first, that Defendant Robinson waived review of the issue regarding the motion to continue because she failed to raise it in her motion for new trial and only raised the due process claim. This, the State contends, limits our review with respect to the trial court's denial of the motion for continuance to a plain error review. The State asserts that this issue does not warrant relief pursuant to a plain error review.

Defendant Shoffner contends that the State required that each of the three attorneys be present at the same time in order to view the evidence. By the time all their schedules allowed for a viewing, it was four days until trial. Defendant Shoffner contends that the State's actions constitute prosecutorial misconduct, which negatively impacted his ability to prepare a defense. The State counters that this issue is without merit.

### 1. Due Process

The first issue we must address is whether Defendant Robinson's due process rights were infringed upon by her failure to view the evidence in the case until four days before trial. Defendant Robinson asserts that it was not until viewing the evidence that she realized

that there was a chain of custody issue (in part because the evidence bags were not sealed), so the delay in viewing the evidence was improper and impermissible.

Article 1, § 8 of the Tennessee Constitution provides as follows:

> Declaration of Rights. No man to be disturbed but by law.—That no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land.

The phrase, "the law of the land," used in this section of our State Constitution, and the phrase, "due process of law," used in the Fifth Amendment and in the first section of the Fourteenth Amendment to the Constitution of the United States, are synonymous phrases meaning one and the same thing. *Dearborne v. State*, 575 S.W.2d 259 (Tenn.1978); *Daugherty v. State*, 216 Tenn. (20 McCanless) 666, 393 S.W.2d 739 (1965), U.S. cert. denied, 384 U.S. 435 (1966). The rights protected under these constitutional provisions can be understood in three categories: (1) "procedural due process;" (2) the individual rights listed in the Bill of Rights, "incorporated" against the states; and (3) "substantive due process." Here, Defendant Robinson suggests that her procedural due process rights were violated when the State delayed her viewing of the evidence. When an accused alleges that he or she has been denied a constitutional right, the accused must prove the constitutional deprivation by a preponderance of the evidence. *State v. Spurlock*, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993).

Procedural due process requires state and local governments to employ fair procedures when they deprive persons of a constitutionally protected interest in "life, liberty, or property." Procedural due process protections do not prevent deprivations of "life, liberty, or property" but rather guard against "substantively unfair or mistaken deprivations . . . ." *Fuentes v. Shevin*, 407 U.S. 67, 80-81 (1972). Both the right to present evidence, including the right to call witnesses, and the right to know opposing evidence are protected by due process provisions.

In this case, Defendant Robinson asserts that there was potentially a chain of custody issue related to the photographs of the victim and his truck. Defendant Robinson argues that she was prejudiced by the discovery of the chain of custody issue concerning the photographs unseen by her until shortly before trial. Again, Defendant Robinson's attorney concedes that she was invited to view the evidence on two previous occasions but was unable to do so because of other court obligations. Upon viewing the evidence, she became aware that there was potentially a chain of custody issue, and she filed a motion to continue the case with the trial court.

Specifically, as to whether the State violated Defendant Robinson's procedural due process rights by the failure to provide access to the evidence sooner, we conclude that Defendant Robinson has not proven a constitutional infringement by a preponderance of the evidence. Importantly, the State invited Defendant Robinson's attorney on two previous occasions to view the evidence. While the trial court admonished the State in the future to not wait until all parties could be present to view the evidence, and we agree, we cannot conclude that the State's actions violated Defendant Robinson's constitutional rights. She viewed the evidence before trial, and she raised the chain of custody concerns during the trial, effectively cross-examining the State's witnesses in this regard. Further, Defendant Robinson's attorney was given photographs of the victim taken by investigators at the crime scene but was not provided other photographs taken of him at the emergency room, in part because the State was unaware that they existed. These photographs, as well as the photographs of the victim's abandoned truck, are not so substantially different that the delay caused a constitutional violation. We conclude she is not entitled to relief on this issue.

## 2. Motion to Continue

We next turn to decide whether the trial court erred when it denied Defendant Robinson's motion to continue based upon her delay in viewing the evidence. She notes that, during her viewing of the evidence, she discovered a potential chain of custody issue, and she saw for the first time emergency room photographs of the victim and Sheriff's Department photographs of the victim's abandoned truck. The State correctly notes that the Defendant failed to raise this issue in her motion for new trial.

> [N] o issue presented for review shall be predicated upon error in the admission or exclusion of evidence, misconduct of . . . counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issue will be treated as waived.

Accordingly, Defendant Robinson has waived this issue, and our review is limited to review for plain error.

The doctrine of plain error only applies when all five of the following factors have been established:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused must not have waived the issue for tactical reasons; and
> (e) consideration of the error must be "necessary to do substantial justice."

31

*State v. Page*, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting *State v. Terry*, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *Id*. at 231.

The decision of whether to grant a continuance is left to the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion and prejudice to the defendant. *State v. Vaughn*, 279 S.W.3d 584, 598 (Tenn. Crim. App. 2008) (citing *State v. Blair*, 145 S.W.3d 633, 640 (Tenn. Crim. App. 2004); *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004)). On appeal, appellant bears the burden of demonstrating that harm ensued from the denial of the requested continuance. *Id*. (citations omitted); *see also Baxter v. State*, 503 S.W.2d 226, 230 (Tenn. Crim. App. 1973). An appellant may demonstrate an abuse of discretion by establishing that he was denied a fair trial or that one could reasonably conclude that a different result would have been reached had the motion been granted by the trial court. *Id*. (citing *State v. Thomas*, 158 S.W.3d 361, 392 (Tenn. 2005); *State v. Goodwin*, 909 S.W.2d 35, 44 (Tenn. Crim. App. 1995)).

Pursuant to our review, we conclude that Defendant Robinson has not proven that a clear and unequivocal rule of law has been breached. When denying Defendant Robinson's motion to continue, the trial court found that she had not suffered any prejudice by any delay in disclosure because she already had access to similar photographs of the victim and because there was no prejudice in any delay in disclosure of photographs of the victim's abandoned truck. We conclude that the trial court did not breach any unequivocal rule of law in its ruling. We further conclude that Defendant Robinson has not demonstrated that the denial of the continuance prejudiced her to the extent that she was denied a fair trial or that she would have received a different result otherwise. *See, e.g., State v. Thomas Lee Hutchison*, No. E2012-02671-CCA-R3-CD, 2014 WL 1423240, at *34 (Tenn. Crim. App., at Knoxville, Apr. 11, 2014) (finding no error when the defendant sought a continuance on the first day of his trial to review the prosecution's late disclosure of photographs of the defendant's clothing when the defendant had the opportunity to thoroughly cross-examine the TBI agent responsible for testing the items of clothing depicted in the photographs, and when the defendant had not asserted that he would have discovered any additional information about the photographs had he been granted a continuance), *aff'd*, 482 S.W.3d 893 (Tenn. 2016). Accordingly, we conclude that this issue does not rise to the level of plain error, and she is not entitled to relief.

### 3. Prosecutorial Misconduct

Defendant Shoffner contends that the State required that each of the three attorneys be present at the same time in order to view the evidence. By the time that all their schedules

allowed for a viewing with all present, it was four days before trial. Defendant Shoffner contends that the State's actions constitute prosecutorial misconduct, which negatively impacted his ability to prepare a defense. The State counters that this issue is without merit.

Tennessee Rule of Criminal Procedure 16 (a)(1)(F) lists the evidence that is subject to disclosure by the State. That includes documents and objects. The rule states that,

> Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings, or places, or copies or portions thereof, if the item is within the state's possession, custody, or control and:
>
> (i) the item is material to preparing the defense;
> (ii) the government intends to use the item in its case-in-chief at trial; or
> (iii) the item was obtained from or belongs to the defendant.

To enforce the rule, Rule 16(d)(2), provides that if there has been noncompliance, the trial court may order the offending party to permit the discovery or inspection, grant a continuance, prohibit the introduction of the evidence not disclosed or enter such other order as the court deems just under the circumstances. "[T]here is no mandatory exclusion that follows a violation." *State v. Sherri Mathis*, M2009-00123-CCA-R3-CD, 2012 WL 4461767, at *37 (Tenn. Crim. App., Nashville, Sept. 26, 2012), *perm. app. denied* (Tenn. Feb. 25, 2013). Indeed, exclusion of the evidence is disfavored.

> [E]vidence should not be excluded except when it is shown that a party is actually prejudiced by the failure to comply with the discovery order and that the prejudice cannot be otherwise eradicated. *See* Rule 16(d)(2). The exclusionary rule should not be invoked merely to punish either the State or the defendant for the deliberate conduct of counsel in failing to comply with a discovery order. The court's contempt powers should be employed for this purpose. Rules 12 and 16, as well as the other Rules of Criminal Procedure [,] were adopted to promote justice; they should not be employed to frustrate justice by lightly depriving the State or the defendant of competent evidence.

*State v. Garland*, 617 S.W.2d 176, 185-86 (Tenn. Crim. App. 1981); *State v. James*, 688 S.W.2d 463, 466 (Tenn. Crim. App. 1984); *State v. Briley*, 619 S.W.2d 149, 152 (Tenn. Crim. App. 1981).

The test to be applied in reviewing a claim of prosecutorial misconduct is "whether the improper conduct could have affected the verdict to the prejudice of the defendant."

*Brimmer v. State*, 29 S.W.3d 497, 527 (Tenn. Crim. App. 1998) (citing *Harrington v. State*, 215 Tenn. 338, 385 S.W.2d 758, 759 (Tenn.1965)).

In the case under submission, the State did require that all three attorneys be present in order to view the evidence, which the trial court stated was not the better practice; rather the court encouraged the State to allow the individual attorneys to view the evidence as their schedules allowed. This conduct, however, does not rise to the level of "improper conduct" as contemplated by our rules. Further, we agree with the trial court that Defendant Shoffner has not shown that conduct by the prosecutor, improper or not, affected the verdict to the prejudice of Defendant Shoffner. Defendant Shoffner's attorney, along with the other defense attorneys, adequately, thoroughly, and effectively cross-examined the State's witnesses regarding the evidence. As such, we conclude that he has not met this burden and is not entitled to relief on this issue.

## D. Chain of Custody

Defendants Duncan and Shoffner contend that the State failed to establish a sufficient chain of custody for the physical evidence. Defendant Duncan asserts that the State's witnesses were unable to establish that any of the physical evidence was properly collected or stored. He notes that the officers could not offer explanations as to why the bags were not sealed and some evidence was misplaced or missing. Defendant Shoffner agrees, noting that none of the evidence was tested for fingerprints, gunshot residue, or gasoline residue. He argues that it is not the duty of the defense to prove that evidence was tampered with or substituted, but it is the burden of the prosecution to demonstrate that it is reasonably certain that no tampering, alteration, or substitution occurred, which he says it failed to do in this case.

The State counters first that the defendants' arguments are waived because they were not included in the motion for a new trial and that the defendants failed to contemporaneously object to the admission of any evidence other than the jacket. The State notes that, if the chain of custody was inadequate for any item, it was incumbent upon the defendants to move to strike the evidence, which they did not do. The State notes that this may have been a tactical decision and that this issue does not warrant review.

When addressing this issue again at the conclusion of the motion for new trial hearing, the trial court stated:

> "[I]f you go back and look at this exhibit, you show the picture of the phone
> on the bag, and you can see the bag and the phone, and you can see the
> description. And when [Lieutenant] Levasseur received those bags, they were

in the right . . . bag. So those phones were bagged correctly, according to this exhibit.

The Court just surmises that due to the handling of the evidence by six attorneys and various witnesses, that someone put the phone in the wrong bag.

But in looking at that in the chain of custody, there's a condition precedent to the introduction of any type of tangible evidence. The witness has to identify the evidence or establish. So they either identify the evidence or establish an unbroken chain of custody. And this is to ensure that there's been no tampering or loss or substitution or mistake with respect to the evidence.

So in this case, we have lots of evidence, but the only evidence that was ever submitted for any type of analyses was the phone, or were the phones. And there was no testimony, and there's not been any testimony of any type of tampering. There has not been any testimony that anything has been substituted.

Every person who testified as to any evidence that was placed into evidence, they identified it. And the Court just did not find any evidence that there was any tampering or anything of that nature, and that the chain of custody had been established.

But again, if you go back and look at the Exhibit . . . you'll see that when Agent Levasseur, and he testified as to his report and testified, you'll see that the phones are in the correct bags at that time prior to his analyzing the phones. And I believe his testimony was that he did not see any evidence of any type of tampering. So I don't find that there's a problem there.

We review challenges to the chain of custody of evidence under the abuse of discretion standard. *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000); *State v. Beech*, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987). Under this standard, we will not reverse unless the trial court "'applied an incorrect legal standard or reached a decision [that] is against logic or reasoning that caused an injustice to the party complaining.'" *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)).

As required by Rule of Evidence 901(a), it is "well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody." *State v. Holbrooks*, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998); *see also, e.g., State v. Cameron*, 909 S.W.2d 836, 850 (Tenn.

Crim. App. 1995). The purpose of the chain of custody requirement is "to demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence." *See State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993). The identity of tangible evidence, however, need not be proven beyond all possibility of doubt, *see State v. Holloman*, 835 S.W.2d 42, 46 (Tenn. Crim. App. 1992), and the State is not required to establish facts which exclude every possibility of tampering, *see State v. Ferguson*, 741 S.W.2d 125, 127 (Tenn. Crim. App. 1987). The rule does not require absolute certainty of identification. *Ritter v. State*, 3 Tenn. Crim. App. 372, 462 S.W.2d 247 (1970). The evidence may be admitted when the circumstances surrounding the evidence reasonably establish the identity of the evidence and its integrity. *Holloman*, 835 S.W.2d at 46. "Reasonable assurance, rather than absolute assurance, is the prerequisite for admission." *State v. Kilpatrick*, 52 S.W.3d 81, 87 (Tenn. 2000). Absent sufficient proof of the chain of custody, however, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." NEIL P. COHEN, ET AL., TENNESSEE LAW OF EVIDENCE § 901.12, at 624 (3d ed.1995).

The State correctly contends that the Defendant Duncan risked waiving this issue by failing to raise it in his motion for new trial. In consideration of the joint nature of this issue, and its inclusion in Defendant Shoffner's motion for new trial, we will, as the trial court did, review this issue on its merits.

To the extent the State contends that the defendants waived this issue for failing to contemporaneously object, we disagree. The defendants in this case filed a motion *in limine* pretrial to exclude the evidence about which they now complain. In *Goines v. State*, 572 S.W.2d 644 (Tenn. 1978), the Court held that the action of a trial judge in overruling a pre-trial motion to suppress evidence was sufficiently clear and definitive under the circumstances of that case that a further objection to the testimony when offered at trial was not necessary. The Court revisited this holding in the context of whether a motion in limine preserved an issue in *State v. McGhee*, 746 S.W.2d 460, 462 (Tenn. 1988). In its holding, the *McGhee* court quoted *Goines*, which stated that a trial objection would have been preferable but, nevertheless:

> "The test must be whether the issue was fairly raised, or phrasing it another way, whether the trial judge was fairly apprised of petitioner's objection or given a reasonable opportunity to consider the matter. [Citation omitted]
>
> "It would be manifestly unjust to apply the waiver rule in this case where the petitioner, in advance of trial, fairly apprised the Court of the substance of his objection to the testimony and

where on motion for a new trial the Court was again apprised of the petitioner's contentions.

> "Making a motion to suppress or objecting to the testimony after the trial judge had overruled petitioner's motion and held that there was probable cause for the arrest, would have been an idle ceremony and a useless gesture. The courts do not demand that counsel engage in futile efforts. The trial judge had ruled; the question had been resolved; there was nothing left to decide. Further effort would have been argumentative, repetitious and foredoomed to certain failure." 572 S.W.2d at 649.

> We adhere to the decision in that case where the record on a pretrial suppression motion or on a motion in limine clearly presents an evidentiary question and where the trial judge has clearly and definitively ruled.

> In many instances, however, including the present case, issues are only tentatively suggested or the record only partially and incompletely developed in connection with a motion in limine. Counsel necessarily take some calculated risks in not renewing objections in such cases.

*Id*. at 462. Accordingly, in this case, we conclude that the motion in limine filed by the defendants on this issue preserved the issue for our review, and they did not waive the issue by failing to contemporaneously object.

We now turn to address to what tangible evidence the defendants object. The defendants cursorily mention multiple pieces of evidence, some of which was offered for identification but not ever admitted into evidence. They, however, mention the following evidence: the white cell phone found on Defendant Duncan at the time of his arrest; evidence found in Defendant Duncan's vehicle on April 11, 2016, including a red digital camera, a roll of duct tape, a knit cap, and a black cell phone; evidence found in Defendant Duncan's vehicle on April 14, 2016, including black ski masks, a black cell phone, a charger and four bank cards; the cell phones; and items found at Defendant Robinson's home, including a Braves' cap and Adidas jacket. Of the evidence listed, the only items of tangible evidence that were actually introduced during the trial were: the Braves' cap and jacket and two cell phones, one belonging to the victim and one belonging to Defendant Shoffner.

At the motion for new trial, the trial court stated:

The contention that the Trial Court erred when it allowed physical evidence in, specifically, a ball cap. In Volume 6, on Page 654 of the transcript for trial, the Defense has contended that a ball cap belonging to [Defendant] Shoffner was allowed in, which was not identified. Nobody had any idea where it came from.

The testimony there was Mr. Hundley, he was asked directly about observing the baseball cap and where it was located. That witness identified where it was, and also collected it and identified it here in Court, and it was moved in properly with the chain of custody.

The Defense also argued in their motion that DNA was not tested, there's no forensic testing here except for Lieutenant Scott Levasseur with the Dickson County Sheriff's Office. And in that, he did a cell phone extraction. Lieutenant Levasseur testified about how he received the cell phones, how they were labeled.

We had testimony from Agent Lamping, [Mr.] Hundley, and Lieutenant Heflin about the collection of those cell phones. There was nothing to indicate that they had been tampered with or misidentified at the time that the forensic testing was completed by Lieutenant Levasseur.

Professor Neil Cohen and his colleagues have aptly summarized the rule:

The concept of a "chain" of custody recognizes that real evidence may be handled by more than one person between the time it is obtained and the time it is either introduced into evidence or subjected to scientific analysis. Obviously, any of these persons might have the opportunity to tamper with, confuse, misplace, damage, substitute, lose and replace, or otherwise alter the evidence or to observe another doing so. Each person who has custody or control of the evidence during this time is a "link" in the chain of custody. In theory at least, testimony from each link is needed to verify the authenticity of the evidence and to show that it is what it purports to be. Each link in the chain testifies about when, where, and how possession or control of the evidence was obtained; its condition upon receipt; where the item was kept; how it was safeguarded, if at all; any changes in its condition during possession; and when, where and how it left the witness's possession.

NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 9.01[13][c] (5th ed.2005) (footnotes omitted).

Even though each link in the chain of custody should be sufficiently established, this rule does not require that the identity of tangible evidence be proven beyond all possibility of doubt; nor should the State be required to establish facts which exclude every possibility of tampering. *Scott*, 33 S.W.3d at 760. An item is not necessarily precluded from admission as evidence if the State fails to call all of the witnesses who handled the item. *See State v. Johnson*, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984). Accordingly, when the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence. On the other hand, if the State fails to offer sufficient proof of the chain of custody, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." *Scott*, 33 S.W.3d at 760 (quoting COHEN ET. AL., TENNESSEE LAW OF EVIDENCE § 901.12, at 624 (3d ed. 1995)).

We first conclude that both the black Adidas jacket and Braves cap were identified by law enforcement officers. Law enforcement officers saw those garments, similar to or the same as the ones worn by Defendant Shoffner in the video surveillance at the ATMs, at Defendant Robinson's house when they went to speak with her. They collected those items, placed them in Lieutenant Heflin's control, where they remained until checked in to a new evidence room. Mr. Hundley described the uniqueness of the hat specifically, and he said that both items of clothing appeared to be the same as the ones he gathered at Defendant Robinson's house. This is sufficient to "identify" the items for chain of custody purposes, and the trial court did not abuse its discretion by admitting this evidence. In further support of our holding, the chain was also established in that Lieutenant Heflin described how the items were kept in a box labeled with this case number, which he stored in his office. His office itself was kept locked when he was not present and was in a locked section of a building accessible only with a pass card. When the Sheriff's Department created an evidence room, he placed the box in the care and control of the evidence custodian up until trial. There is no evidence that this evidence was tampered with or stored incorrectly.

We similarly conclude that the trial court did not abuse its discretion when it determined that there was adequate evidence establishing the identity or chain of custody of the other evidence admitted. The officers who gathered the phones identified them and stated they put them into evidence bags. Agent Lamping put a sticker on the phone identifying it. Lieutenant Levasseur offered photographs of the evidence bags and cell phones, which showed that the appropriate phone was in the appropriate bag at the time he examined the phones. Each phone contained information, and or evidence, evincing to him it belonged. For instance, Defendant Shoffner's phone was associated with his email address. The victim's phone, which he identified, had information and photographs belonging to the victim. Both phones used respectively the known phone numbers of Defendant Shoffner and the victim.

Finally, the trial court did not abuse its discretion when it admitted any additional evidence. The State offered multiple photographs showing where and how the evidence was gathered, officers identified the evidence, and the evidence was stored using the procedures previously described. Further, even if we were to hold that there was error in admitting evidence, we would deem any error harmless. We apply a harmless error analysis to "virtually all evidentiary errors . . . ." *State v. James*, 81 S.W.3d 751, 763 (Tenn. 2002); *see* Tenn. R. Crim. P. 52(a) ("No conviction shall be reversed on appeal except for errors that affirmatively appear to have affected the result of the trial on the merits."); Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). As this Court has previously stated:

> Whether error in the admission of evidence is prejudicial is gauged by the substance of the evidence, its relation to other evidence, and the peculiar facts and circumstances of the case, and whether such admission is sufficient ground for reversal depends on the facts in each case; and the appellate court will consider the record as a whole in determining the question of prejudice or reversibility.

*Blankenship v. State*, 219 Tenn. 355, 410 S.W.2d 159, 161 (1966) (quoting 24B C.J.S. CRIMINAL LAW § 1915(2)).

As stated, the trial court did not abuse its discretion in admitting key pieces of evidence, as the evidence was either identified or the chain of custody established. The admission of any evidence that was not identified or for which the chain of custody was not established, is harmless.

### E. Cell PhoneTower Maps

The exhibit about which the defendants complain was created by a State witness, Thomas Bell, using a program called "Penlink." It represented an aerial view of the county, and it included locations of the victim's home, Defendant Robinson's home, and other locations relevant to this case, such as ATM locations. Layered on top of the map locations, were pie shapes that represented the locations of the cell phone towers that were "pinged" by the phones involved in this case. Mr. Bell testified as an analyst and acknowledged that he could not explain technical details about cell tower transmission. He explained that cell towers are three-sided, and he used the pie shape to show the sector of the tower that the cell phone was on when the call from the cell phone was placed. The shaded areas indicated the direction the calls came from and did not necessarily indicate the area within which the cell phone was located.

Defendant Duncan and Defendant Shoffner contend that the trial court erred when it admitted this exhibit. Defendant Shoffner contends that the exhibit that the State offered was "unfairly prejudicial due to its inaccuracy and misleading depiction of the location of the Defendants." He asserts that the pie shape diagrams did not reflect the distance capacity of the cell phone tower and were instead drawn with no reference to scale other than angle, giving the visual impression that any cell phone pinging a particular tower was in a specific geographic location represented by the pie shape. Defendant Duncan contends that the unfair prejudice outweighs by any probative value of the evidence. He notes that the pie shape wedge on the diagram indicated the side of the tower off which the cell phone pinged and *did not* indicate the location of the cell phone at the time that it pinged off the tower. Further, the pie shape did not represent the proximity of the cell phone to the cell phone tower. This pie shape, he contends, was prejudicial and misleading and inflammatory. He further asserts that he was prejudiced by his late-receipt, five days before trial, of the exhibit.

Prior to Mr. Bell's testimony, and outside the presence of the jury, the trial court addressed Defendant Shoffner's *motion in limine* to exclude the cell phone location mapping. The trial court first found that the defense had in their possession the cell phone data for "some time." It then cited to *State v. Timothy Leron Brown*, No. M2017-00904-CCA-R3-CD, 2019 WL 1514551, at \*46 (Tenn. Crim. App., at Nashville, Apr. 8, 2019), *no Tenn. R. App. P. 11 application filed*, which held that a layperson could plot out different type of cell sites using a defendant's cell phone records and, from that, draw an inference. The trial court went on to state:

> And what he's testifying, and that's the reason why I asked him, is that these are cell phone towers . . . the cell phone records that he took, that the cell phone hit that tower. And from that, you can infer that the person was within the vicinity of that tower.

> Certainly, he can't say two miles, five miles, or anything like that. And you certainly can cross examine. He's been very forthright and upcoming about, he can't tell, but it's in the vicinity with that.

> So at this point in time, you're looking at, and then you're going further and saying, well, this exhibit is going to be prejudicial. And certainly if you have some type of . . . I guess, a computer animation or something similar to that that he created. And it's based upon what his testimony is going to be.

> And so it could be excluded if its probative value is substantially outweighed by any unfair prejudice. So basically, what this is showing is the location of the towers, which he's going to testify to. It's showing the phone

calls that were made based on the reports, cell phone reports he received from law enforcement. . . .

> And he's going to say that that cell phone, on that day or that night, hit this cell phone tower. . . .

> So basically, this is showing everything he's going to testify to. Certainly, during cross examination, you can bring out, fine, we have a cell phone tower at this location. You're saying this particular cell phone hits this tower. Does that mean that you can say this cell phone is within one mile of this tower? No, ma'am, I can't. Can you say that it was within five miles? No, ma'am, I can't. Can you say it's within ten miles? No, ma'am, I can't.

> So you certainly can inquire as to that. So I don't find that it would be unduly prejudicial. And so I'm going to allow it to come in.

Generally, "[a]dmission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). The Tennessee Rules of Evidence provide that all "relevant evidence is admissible," unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." *Id*. Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Whether or not to permit demonstrative evidence of this sort generally rests within the sound discretion of the trial judge. *E.g., Hughes v. State*, 126 Tenn. 40, 148 S.W. 543, 551 (Tenn. 1912) (holding that, "[Demonstrative] evidence is, of course, largely in the discretion of the trial judge, who may in a proper case refuse to permit his court room to be littered with cumbrous structures that should be represented by maps, diagrams, or photographs."); *State v. Underwood*, 669 S.W.2d 700, 704 (Tenn. Crim. App. 1994) (holding that, "[W]e see no reason why [demonstrative] evidence is not admissible within the discretion and control of the trial judge.); *State v. Douglas Marshall Mathis*, M2002-02291-CCA-R3-CD, 2004 WL 392710, at *10 (Tenn. Crim. App., at Nashville, Mar. 3, 2004) (citations omitted), *perm. app. denied* (Tenn. Oct. 11, 2004). This court has further instructed that "'[d]emonstrative evidence is admissible only if relevant under [Tenn. R. Evid.] 401.'" *State v. Coulter*, 67 S.W.3d 3, (Tenn. Crim. App. 2001) (quoting *Ronald*

*Bradford Waller v. State*, No. E1999-02034-CCA-R3-PC, 2000 WL 982103 (Tenn. Crim. App., Knoxville, July 18, 2000), *perm. app. denied* (Tenn. Mar. 5, 2001)). "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; *see also State v. Kennedy*, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided . . . . Evidence which is not relevant is not admissible." The trial court has the discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion. *State v. Forbes*, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995). Rule 403 offers additional grounds for the exclusion of relevant evidence: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Like all evidence, the demonstration must be relevant evidence, and its probative value must not be substantially outweighed by the danger of unfair prejudice and it must not be misleading. *See e.g., Christopher Lovin v. State*, No. E2009-00939-CCA-RM-PC, 2010 WL 4540066, at *11 (Tenn. Crim. App., at Knoxville, Nov. 10, 2010), *perm. app. denied* (Tenn. Apr. 14, 2011).

If the court, in its discretionary authority, finds that the probative value is *substantially* outweighed by its prejudicial effect, the evidence may be excluded. Tenn. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."). Clearly, Rule 403 is a rule of admissibility, and it places a heavy burden on the party seeking to exclude the evidence. *State v. James*, 81 S.W.3d 751, 761 (Tenn. 2002) (citing *See Roy v. Diamond*, 16 S.W.3d 783, 791 (Tenn. Ct. App. 1999)). "Excluding relevant evidence under this rule is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion." *Id.* (citing *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999)).

This court has recognized that a layperson could plot cell sites listed in a defendant's cell phone records on a map and draw an inference that the defendant traveled near the cell towers and that, as a result, such testimony does not require the specialized knowledge contemplated by Tennessee Rule of Evidence 702. *See e.g., State v. Johnny Lorenzo Wade*, No. W2017-00933-CCA-R3-CD, 2018 WL 3414471, at *11 (Tenn. Crim. App., at Jackson, July 13, 2018), *perm. app. denied* (Tenn. Nov. 15, 2018); *State v. Dominique Greer*, No. E2015-00922-CCA-R3-CD, 2017 WL 2233647, at *16 (Tenn. Crim. App., at Knoxville, May 17, 2017), *no. Tenn. R. App. P. 11 application filed*; *State v. Clarence D. Hayes*, No. M2008-02689-CCA-R3-CD, 2010 WL 5344882, at *10 (Tenn. Crim. App., at Nashville, Dec. 23, 2010), *perm app. denied* (Tenn. May 25, 2011). This Court has held that cell phone

tower location data allows the inference that the cell phone was in the vicinity of the tower at the time it pinged the tower. *Brown*, 2019 WL 1514551, at *46.

In the case under submission, the State offered a cell tower map that included pie wedges that showed the side of the tower that the calls were routed and did not indicate how close the relevant cell phones were to the tower. We conclude first that the trial court did not abuse its discretion when it found that this demonstrative evidence was relevant. The defendants' phones in this case pinged off towers at a time and from a direction that showed that the phones were within vicinity to relevant locations, namely the victim's home and locations where the victim's ATM card was located. The data indicated that the phones were pinging off a tower near Defendant Robinson's home both before and after these events and that the phones were not using that same tower during the time of these events.

Because we agree with the trial court that the evidence was relevant, we now turn to decide whether the defendants have met their "significant burden of persuasion" that the trial court abused its discretion when it determined that the otherwise admissible evidence was not misleading. We conclude that the defendants have not so proved. The evidence was admitted through a lay witness who admitted that he did not have expertise in cell phone technology. He thoroughly explained, during direct and cross-examination, what the pie shapes on the map depicted and that he could not say how close the cell phones were to the towers when they pinged the towers. We conclude, as did the trial court, that this evidence was not misleading, and the trial court did not err when it allowed the State to offer it. As a final note, given the weight of the evidence against the defendants, including actual surveillance footage of one of them when the victim's ATM card was used, we conclude that any error in this evidence's admission would be harmless.

### F. Facilitation Instruction

Defendant Duncan and Defendant Shoffner next contend that the trial court erred when it did not instruct the jury on facilitation. At trial, before the jury was charged, the defendants orally requested that the trial court instruct the jury on the lesser-included offenses of solicitation and facilitation. The trial court declined, and the defendants now appeal, contending that this was error. The State counters that the defendants have waived this issue by failing to formally request the instructions in writing and that the issue does not warrant plain error review.

Upon written request by either party, "the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser[-]included offense of the offense charged in the indictment[.]" T.C.A. § 40-18-110(a) (2019). In determining whether an offense is a lesser-included offense of the charged crime, the trial court should consider the evidence "in the light most favorable to the existence of the lesser-included

44

offense." *State v. Ely*, 48 S.W.3d 710, 722 (Tenn. 2001). When a defendant is charged with a felony through criminal responsibility for the actions of another, facilitation of the felony is a lesser-included offense. *State v. Fowler*, 23 S.W.3d 285, 288 (Tenn. 2000). In the absence of a written request, a trial court may instruct a jury on lesser-included offenses, but a defendant is not entitled to such an instruction, and the failure of the trial court to give such an instruction is waived as an issue on appeal. T.C.A. § 40-18-110(b), (c). However, the issue may be reviewed for plain error. *State v. Page*, 184 S.W.3d 223, 230-31 (Tenn. 2006).

We conclude the defendants have failed to establish that he is entitled to plain error relief. We may consider an issue to be plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice.

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). Furthermore, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)).

The trial court's failure to instruct the jury on solicitation and facilitation does not rise to the level of plain error because consideration of the issue is not necessary to do substantial justice. Considering the weight of the evidence presented and the defenses presented by the parties, we conclude that the omission of the solicitation and facilitation instructions did not affect the outcome of the trial. As such, consideration of this issue is not necessary to do substantial justice. The defendants are not entitled to relief on this issue.

### G. Impeachment Request

Defendant Robinson contends that the trial court erred when it denied her impeachment request. She contends that one of the law enforcement officers who testified was fired from employment on May 16, 2016 for having sent and or received inappropriate text messages with a confidential informant. She contends that her counsel should have been allowed to question this witness regarding his firing because such evidence was relevant to the witness's truthfulness. The State contends that the trial court did not abuse its discretion in this regard.

During the trial, a law enforcement witness was called to testify whom was no longer with the sheriff's office. The trial court held a jury-out hearing, during which the parties explored the basis for his termination. The trial court ruled that the line of questioning regarding the witness's termination was not relevant and, as such, inadmissible.

A defendant has the right to confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Tennessee Constitution. *See State v. Smith*, 893 S.W.2d 908, 924 (Tenn. 1994); *see also State v. Black*, 815 S.W.2d 166, 177 (Tenn. 1991).

> "[A] criminal defendant states a violation of the [federal] Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, thereby exposing to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witnesses."

*Black*, 815 S.W.2d at 177 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)).

Generally speaking, a denial of the right to an effective cross-examination is "constitutional error of the first magnitude and amounts to a violation of the basic right to a fair trial." *State v. Hill*, 598 S.W.2d at 819. The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the discretion of the trial court. *Coffee v. State*, 188 Tenn. 1, 4, 216 S.W.2d 702, 703 (1948); *Davis v. State*, 186 Tenn. 545, 212 S.W.2d 374, 375 (1948). Appellate courts may not disturb limits on cross-examination except when there has been an unreasonable restriction on the right. *State v. Fowler*, 213 Tenn. 239, 253, 373 S.W.2d 460, 466 (1963); *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn.Crim.App.1984).

Tennessee Rule of Evidence 608(b) allows the admission of specific instances of conduct under certain circumstances. The rule provides, in part, as follows:

> Specific Instances of Conduct.—Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's credibility, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness or concerning the character for truthfulness or untruthfulness of another witness as to which the character witness being cross-examined has testified. The conditions which must be satisfied before allowing inquiry on

cross-examination about such conduct probative solely of truthfulness or untruthfulness are:

> (1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry; [and]

> (2) The conduct must have occurred no more than ten years before commencement of the action or prosecution, but evidence of a specific instance of conduct not qualifying under this paragraph (2) is admissible if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence and the court determines in the interests of justice that the probative value of that evidence, supported by specific facts and circumstances, substantially outweighs its prejudicial effect[.]

Tenn. R. Evid. 608(b)(1) & (2). This rule authorizes proof of a prior bad act which is relevant to a person's character for truthfulness or untruthfulness.

Having reviewed the transcript and briefs, we do not believe that Defendant Robinson has proven that the trial court unreasonably restricted her right to cross-examine the witness. The evidence surrounding his termination was not relevant in that it made any fact in evidence that was of consequence more probable or less probable. Further, the text messages exchanged, while "explicit," were not related to this case. There was no evidence that the text messages were concealed or that the officer made false statements or lied about the messages. We acknowledge that courts of this state have determined that evidence that a police officer's solicitation of an underage girl could be properly used for impeachment, but we are bound by our standard of review, which heavily defers to the trial court's discretion. That standard is whether the trial court abused its discretion in prohibiting this line of questioning. We determine that, given the evidence presented during the jury-out hearing and the arguments of the parties, the trial court did not abuse its discretion. Defendant Robinson is not entitled to relief on this issue.

## H. Sufficiency of Evidence

All the defendants contend that the evidence is insufficient to sustain their convictions. Defendants Robinson and Duncan contend that the evidence was insufficient to support their identities as the perpetrators because of the unreliability of the victim's

identification. Defendant Shoffner contends that the evidence did not prove that he was guilty under a theory of criminal responsibility.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

48

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

We agree that the identity of the perpetrator is an essential element of any crime, and therefore must be proven by the State beyond a reasonable doubt. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). We would also note that issues of identity and credibility are classic jury questions. *State v. Gregory Mullins*, No. E2004-02314-CCA-R3-CD, 2005 WL 2045151, at *5 (Tenn. Crim. App., at Knoxville, Aug. 25, 2005), *no Tenn. R. App. P. 11 application filed*. And, as stated above, questions concerning the credibility of the witnesses are resolved by the trier of fact. *Evans*, 108 S.W.3d at 236. This court does not second-guess the weight, value, or credibility afforded to the evidence by the jury. That said, there was sufficient evidence presented to prove Defendant Robinson's and Defendant Duncan's identity. The victim testified that neither defendant wore a face covering for the duration of the attack, and he identified them in court. Defendant Robinson lived with Defendant Shoffner, who was the victim's former stepson. She was gone from her house on the evening in question, having hired a babysitter to care for her child. There were multiple phone calls between her cell phone and the cell phones of Defendants Duncan and Shoffner, including through the night of the attack. Clothing matching the description of the clothing seen worn by Defendant Shoffner while he was using the victim's ATM card was found in Defendant Robinson's home, along with the victim's security system that was stolen during the attack. Law enforcement officers found the victim's cell phone and paperwork on Defendant Duncan's person and the victim's digital camera in Defendant Duncan's vehicle. Defendant Duncan is depicted in a surveillance video attempting to use the victim's ATM card. Therefore, we conclude that the State presented sufficient evidence of identity to support the defendants' convictions.

We similarly conclude that there was sufficient evidence of Defendant Shoffner's criminal responsibility. Defendant Shoffner, who was Defendant Robinson's boyfriend and lived with her, was the victim's former stepson. Based upon the victim's statements regarding the perpetrators' gaining his ATM card, law enforcement officers obtained the victim's bank records and surveillance videos from the transactions using his card on the night in question. In one of those videos, Defendant Shoffner is seen driving a truck matching the description of the victim's truck that was stolen, using the victim's ATM card and wearing a distinctive Braves cap and jacket. When officers went to Defendant

Robinson's house later that day, where Defendant Shoffner was located, they saw and confiscated the same cap and jacket. Cell phone records showed that the cell phone attributed to Defendant Shoffner communicated with those of Defendant Robinson and Duncan during the evening of this attack. It also "pinged" to towers located near the relevant locations in this case around the time of the events of this case.

We conclude that the evidence, viewed in the light most favorable to the State, clearly proved the defendants' identities and Defendant Shoffner's criminal responsibility.

## I. Sentencing

All three defendants contend that the trial court erred when it sentenced them. For the Class A felony convictions—aggravated arson and especially aggravated kidnapping—the trial court sentenced Defendant Robinson, a Range I offender, to concurrent twenty-five-year sentences. For the Class B felony convictions—attempted second degree murder and aggravated robbery—the trial court sentenced Defendant to concurrent twelve-years sentences. For the Class D felony theft conviction, the trial court sentenced Defendant Robinson to four-years. The trial court ordered that the effective twenty-five-year sentence run consecutively to the effective twelve-year sentence and concurrently to the four-year sentence, for a total effective sentence of thirty-seven years. On appeal, Defendant Robinson contends that she "is a mitigated offender whose sentence should have been run concurrently as a probationary sentence." She notes that she had no prior felonies, no gang affiliations, and is the single mother of two children.

The trial court sentenced Defendant Duncan as a Range I offender to fifteen years for the Class B felonies—attempted second degree murder and aggravated robbery and to eight years for theft. The trial court sentenced him as a Range II offender to twenty years each for both Class A felony convictions—aggravated arson and aggravated kidnapping. The trial court ordered that all of his sentences run consecutively for a total effective sentence of seventy-eight years. On appeal, he contends that the trial court erred when it sentenced him consecutively and "that any sentences imposed should have been imposed to run concurrently."

The trial court sentenced Defendant Shoffner as a Range II, persistent offender. It sentenced him to fifty years for each Class A felony conviction—aggravated arson and aggravated kidnapping, and to twenty-five years for each Class B felony convictions—attempted second-degree murder and aggravated robbery. It sentenced him to twelve years for the theft conviction. The trial court ordered that all these sentences be served consecutively for a total effective sentence of 162 years. On appeal, Defendant Shoffner does not contest the consecutive nature of his sentences but contends that the trial court erred when it applied several enhancement factors when sentencing him.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2019); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).

In *State v. Bise*, the Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" 380 S.W.3d 682, 708 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001); *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. In other words, so long as the trial court sentences a defendant within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id*. at 707.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c) (2019). The trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35113

51

and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2014); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

"[T]he trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. The trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate Courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008).

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence. As it relates to this case, the trial court found the following criteria applicable: "The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high . . . (6) The defendant is sentenced for an offense committed while on probation . . . ." T.C.A. § 40-35-115(b)(4), (6). The imposition of consecutive sentencing, however, is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed [.]" T.C.A. § 40-35-103(2), (4). We review a trial court's decision to impose consecutive sentences for an abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3rd 851, 860 (Tenn. 2013).

Our case law clearly reflects that in order to impose consecutive sentencing based upon finding that a defendant is a dangerous offender, a court must also find that "(1) the sentences are necessary in order to protect the public from further misconduct by the defendant and [that] (2) 'the terms are reasonably related to the severity of the offenses.'" *State v. Moore*, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996) (quoting *Wilkerson*, 905 S.W.2d at 938); *see also State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). "Where . . . the trial court fails to provide adequate reasons on the record for imposing consecutive sentences, the appellate court should neither presume that the consecutive sentences are reasonable nor defer to the trial court's exercise of its discretionary authority" and can either conduct a de novo review to determine if an adequate basis exists for consecutive sentences or remand the case to the trial court for consideration of the requisite *Wilkerson* factors. *Pollard*, 432 S.W.3d at 864-65.

When sentencing the defendants, the trial court considered all the aforementioned applicable considerations. The trial court thoroughly reviewed the facts of the case, including that it was clear that all three defendants planned this robbery with the intent to kill the victim. She noted that their actions were cold and that they lacked emotion during the trial and during sentencing. The court noted that Defendant Robinson never expressed remorse or apologized to the victim. He further noted that Defendant Robinson had been caught vandalizing the jail. The trial court stated:

> [T]he things I look at [are] this: That . . . [Defendant Robinson], [Defendant] Duncan, and [Defendant] Shoffner, you all have past criminal histories. [Defendant] Shoffner, your criminal history is more than [Defendant] Duncan. And [Defendant] Robinson, you don't have a criminal history, but look at the people you are hanging out with. You've got babies with somebody who's in one of these gangs or whatever.

> And then when you come in the jail, you got all these jail write-ups. You know, it was always my belief, and it still is, is I'm not going to reward anybody for being good in jail. You're supposed to be good in jail. But I sure will punish somebody who's bad in jail.

> So that just shows me what type of person that you all are, you get these write-ups . . . at TDOC, you get those write-ups in jail. You're not going to conform to society. Society needs to be protected from you people."

The trial court went on to make specific findings for each defendant, as articulated below.

## 1. Defendant Robinson

Defendant Robinson contends that the trial court erred when it sentenced her to consecutive sentences and when it denied her probation. The State counters that the trial court was within its discretion to sentence her consecutively and that she was not eligible for probation.

The trial court found that Defendant Robinson had no prior criminal history and that she should be sentenced as a Range I offender. A Range I sentence is as follows:

> (1) For a Class A felony, not less than fifteen (15) nor more than twenty-five (25) years; (2) For a Class B felony, not less than eight (8) nor more than twelve (12) years; (3) For a Class C felony, not less than three (3) nor more

53

than six (6) years, (4) for a Class D felony, not less than two (2) nor more than four (4) years . . . .

T.C.A. § 40-35-112 (2019). The trial court applied the following enhancement factors to Defendant Robinson:

I find 2, that the defendant was a leader in the commission of an offense involving two or more criminal actors. It's quite apparent from the testimony that you were calling the shots. You were on the phone talking to Mr. Shoffner about the PIN number. You were directing [Defendant] Duncan what to do. So you were calling the shots on that. So I find you were a leader in the commission of that offense.

Number 6: Again, the personal injuries inflicted upon or the amount of damage to the property sustained by or taken from the victim was particularly great. Again, you burned down this man's life. You just destroyed this man's life.

Number 9: The defendant possessed or employed a firearm. And, again, that applies only to Counts I and II. It does not apply to the other counts.

Number 10: No hesitation about committing a crime when the risk to human life was high. Again, you all were just cold. [Defendant] Robinson, you are cold. Just cold, cold, cold. Going in there and be able to do that. Especially with somebody who your attorney argues, well, she doesn't have a lot of criminal history or whatever.

That's a pretty -- pretty high place to start, right there, walk in there with a gun. And I don't know if you learned that from your gangland boyfriend or whatever or from some of these shows that are on TV, but you're just cold.

And 24: Again, that the offense involved theft of property, and as a result of the manner in which the offense was committed, the victim suffered significant damage to other property belonging to the victim. So I find that all of those are applicable to you.

The trial court then sentenced Defendant Robinson to the maximum sentence of twenty-five years for both aggravated arson and especially aggravated kidnapping. It sentenced her to the maximum sentence of twelve years for both attempted second degree murder and aggravated robbery, and to the maximum four years for the theft conviction.

The trial court ordered partial consecutive sentences, ordering that the twenty-five-year sentences run concurrently with each other but consecutively to the twelve-year sentences. It also ordered that the four-year sentence run concurrently with the others. When ordering partial consecutive sentencing, the trial court found:

> And, [Defendant] Robinson, you go directly to him with that gun pointed to him, and he has to hear it click the first time, and thinks the second time – and I believe his testimony was, I just hope I get into heaven because I thought I was dead. And you click again. And the terror in that man's mind, I can't fathom that. And then you turn to [Defendant] Duncan and say, kill him, and you leave.

> So I find, [Defendant] Robinson, that [the dangerous offender consideration] applies to you, under the discretionary consecutive sentencing.

The court went on to note that Defendant Robinson was not a mitigated offender, which applied when an offender had no prior criminal history, and the court finds mitigation but no enhancement. The court noted that it had found enhancement but no mitigation, making that section inapplicable.

The trial court noted that Defendant Robinson had committed an offense while incarcerated and expressed doubt that she would ever be rehabilitated, in part because she could not abide by the rules in jail. The trial court found that society must be protected from Defendant Robinson and that incarceration was necessary. The trial court noted that she had seen few defendants as "cold" as these defendants.

We conclude that the trial court did not abuse its discretion when it ordered consecutive sentencing. The trial court found that consecutive sentencing was necessary to protect society from Defendant Robinson. The trial court considered the violent and terrifying facts related to the Defendant Robinson's participation in the home invasion in reaching this conclusion. It noted Defendant Robinson's leadership in these events, her aiming a gun at the victim and attempting to fire it, and her ordering Defendant Duncan to use the gun to kill the victim after her failed attempt. The trial court also noted that Defendant Robinson had not complied with the rules of incarceration.

We further conclude that the length of Defendant Robinson's sentence is justly deserved in relation to the seriousness of these offenses and is no greater than that deserved for the offenses committed. The trial court did not order that the sentences for all of the convictions run consecutively, but instead it ordered that two of the five sentences run consecutively, for a total of thirty-seven years of incarceration. We conclude that the trial

court properly ordered partial consecutive sentencing. The Defendant is not entitled to relief on this issue.

We further agree with the State that Defendant Robinson was not eligible for probation. Defendant Robinson was convicted of aggravated robbery and especially aggravated kidnapping which are specifically excluded as probatable. *See* T.C.A. § 40-35-303(a). Further, her sentence is not ten years or less. *See* T.C.A. § 40-35-303(a). Defendant Robinson is not entitled to relief on this issue.

## 2. Defendant Duncan

Defendant Duncan contends that the trial court erred when sentencing him because all of his sentences should be been ordered to run concurrently. He asserts that the trial court erred when it made findings contrary to the jury findings and findings not based on evidence. He points that the trial court found that the evidence supported a finding of attempted first degree murder, although the jury convicted Defendant Duncan of the lesser-included offense of attempted second degree murder and that it also found that the defendants went to rob the victim to obtain money for drugs. Having reviewed the transcript, the trial court clearly stated that she did not know why the defendants robbed the victim and that it may have been to obtain money for drugs, but this finding had no impact on her findings related to consecutive sentencing.

The trial court ordered consecutive sentencing for Defendant Duncan based upon the fact that he was a dangerous offender who had little or no regard for human life and no hesitation about committing a crime to which the risk to human life was high. The trial court stated, "The circumstances surrounding the commission of the offense are aggravated and the aggregate length of the sentences reasonably relates to the offense of which the defendant stands convicted."

> You went in for the purpose to get some money to steal. And you left this man terrified for his life, and his whole life burned down to ashes.
>
> The terror that this man experienced is beyond belief. That he's tied up in his own home, not knowing how he can get away from these burning flames. And I can't think of anything more painful than to die by fire. You left him there to die.
>
> And then, and I can only surmise, that you came back in to the house and saw that he was gone and went looking for him so that you could kill him, so that the [victim] could not identify you. And then you went down and there

56

he is, trying to hid in the corner of a basement, scrunched up, trying to be as little as possible so that you don't see him. . . .

The trial court further found that Defendant Duncan committed this crime while he was on community corrections, meaning he committed a felony while on parole or other release program.

As previously noted Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence. The trial court properly found that Defendant Duncan was a dangerous offender and that society must be protected from him. It further properly found that he committed this offense while on probation, a factor that is a sufficient basis to support the trial court's imposition of consecutive sentencing. *See* T.C.A. § 40-35-115 (b)(6).

Further, as previously stated, if a trial court misapplies an enhancement or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id*. at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). We conclude that Defendant Duncan's sentence is within the appropriate range and that the sentence is otherwise in compliance with the purposes and principles listed by statute. The Defendant is not entitled to relief on this issue.

### 3. Defendant Shoffner

Defendant Shoffner contends that the trial court erred when it sentenced him because it misapplied several enhancement factors. The State acknowledges that the trial court misapplied one enhancement factor, but it asserts that this misapplication does not invalidate Defendant Shoffner's sentence.

At the conclusion of the sentencing hearing, the trial court found that Defendant Shoffner had ten prior criminal convictions, six of which qualified him for sentencing as a Range III offender. It then applied three enhancement factors: that Defendant Shoffner had a history of criminal convictions in addition to those necessary to establish his range; that Defendant Shoffner was a leader in the commission of this offense (based upon the fact that Defendant Shoffner had lived with the victim and neither other defendant knew the victim); that the personal injuries inflicted upon the victim or the amount of damage sustained by or taken from the victim was particularly great (based on the fact that the victim's home was completely destroyed); that he possessed or employed a firearm during the commission of

the offense (to counts 1 and 2 only based on the co-defendant's use of a weapon); that he had no hesitation about committing a crime when the risk to human life was high; and that he was on a condition of release at the time of his arrest (based on the fact that he was released on bail at the time he was arrested in this case). *See* T.C.A. § 40-35-114 (1), (2), (6), (9), (10) and (13).

The State contends, and we agree, that the trial court properly applied enhancement factors, (1), (2), (6), (9), and (13), but that it erred when it applied enhancement factor (10). Once the trial court determines the sentencing range, it "is free to select any sentence within the applicable range." T.C.A. § 40-35-210 (a), (d); *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). Here, the trial court imposed a within range sentence after properly considering the evidence adduced at trial and the sentencing hearing, the presentence report, the principles of sentencing, the parties' arguments, the nature and characteristics of the crime, and evidence of mitigating and enhancement factors. T.C.A. §§ 40-35-103(5), -114, -210(b). Therefore, Defendant Shoffner's sentence is presumed reasonable, and the defendant is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE